BEVERLY DYANNA CLARK, Administratrix of the Estate of EARNEST CLARK, JR., Appellant v. IRVIN S. PERRY, M.D., and FORSYTH COUNTY HOSPITAL, INC., formerly FORSYTH COUNTY HOSPITAL AUTHORITY, INC., d/b/a FORSYTH MEMORIAL HOSPITAL, Appellees

No. 9221SC314

(Filed 19 April 1994)

## 1. Physicians, Surgeons, and Other Health Care Professionals § 127 (NCI4th)— Jehovah's Witness—blood transfusion—malpractice—failure to show standard of care

The trial court properly entered a directed verdict for defendant attending physician in plaintiff's medical malpractice action based on defendant's alleged negligence in ordering a blood transfusion for plaintiff's husband, a Jehovah's Witness AIDS patient, when his hemoglobin became dangerously low while he was asleep or unconscious after surgery where plaintiff failed to present any expert testimony of the applicable standard of care, and plaintiff's evidence failed to show that defendant knew that plaintff's husband was a Jehovah's Witness and had requested that he not receive blood products. What constitutes reasonable care and diligence in the treatment of plaintiff's husband by defendant was not readily apparent to a layperson, and a lay jury should not have to determine how thorough a consulting or attending physician's review of a patient's records must be before ordering a blood transfusion in a life-threatening, emergency situation.

**Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 357 et seq.**

**Liability of physician or surgeon for extending operations or treatment beyond that expressly authorized. 56 ALR2d 695.**

2. **Physicians, Surgeons, and Other Health Care Professionals § 142 (NCI4th)— Jehovah's Witness—blood transfusion—absence of consent—failure to show standard of care**

The trial court properly directed a verdict for defendant attending physician in plaintiff's medical malpractice action based on defendant's failure to obtain informed consent before ordering a blood transfusion for plaintiff's husband, a Jehovah's Witness AIDS patient, when his hemoglobin became dangerously low while he was asleep or unconscious after surgery where plaintiff produced no appropriate evidence of the applicable standard of care. Deposition testimony by defendant physician setting forth his practice when informed that a patient is a Jehovah's Witness who desires to receive no blood products was insufficient to show the standard of care for obtaining informed consent in the circumstances of this case. There was no evidence of what information about blood transfusions and their usual and most frequent risks and hazards would be, under the circumstances confronted by defendant, customarily provided by other members of the same health profession with similar training and experience and situated in the same or similar communities.

**Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 357 et seq.**

**Liability of physician or surgeon for extending operations or treatment beyond that expressly authorized. 56 ALR2d 695.**

3. **Discovery and Depositions § 65 (NCI4th); Physicians, Surgeons, and Other Health Care Professionals § 104— medical malpractice—failure to identify expert witness—exclusion of testimony**

The trial court did not abuse its discretion by excluding a physician's testimony that it was the "consensus of the medical community" that a competent patient can refuse treatment, including blood transfusions, because of plaintiff's failure in discovery to designate the physician as an expert witness regarding the standard of care. Furthermore, such testimony did not establish the applicable standard of care in obtaining a patient's informed consent for a blood transfusion. N.C.G.S. § 1A-1, Rule 26(f1)(2).

**Am Jur 2d, Depositions and Discovery §§ 373 et seq.**

CLARK v. PERRY

[114 N.C. App. 297 (1994)]

4. **Hospitals and Medical Facilities or Institutions § 62 (NCI4th) — Jehovah's Witness — blood transfusion — liability of hospital — failure to show standard of care**

The trial court properly directed a verdict for defendant hospital in plaintiff's action based on the alleged negligence of hospital employees in administering a blood transfusion to plaintiff's husband, a Jehovah's Witness AIDS patient, pursuant to a physician's order, where there was evidence that the husband's hospital records indicated that he was a Jehovah's Witness and was to receive no blood products, the admitting physician and other hospital personnel knew that plaintiff's husband should receive no blood products, the husband's medical chart taken from the admitting office to his room bore a red label marked "Jehovah's Witness" and "No Blood," and the red label was not on the chart when plaintiff's husband was placed in the ICU, but plaintiff offered no expert testimony as to the standard of care to be followed by employees of defendant hospital in maintaining patient records and in administering blood transfusions pursuant to a physician's order in an emergency situation.

**Am Jur 2d, Hospitals and Asylums §§ 14 et seq.**

**Necessity of expert evidence to support action against hospital for injury to or death of patient. 40 ALR3d 515.**

5. **Hospitals and Medical Facilities or Institutions § 64 (NCI4th) — Jehovah's Witness — blood transfusion — absence of informed consent — corporate liability of hospital — failure to show standard of care**

The trial court properly entered a directed verdict for defendant hospital in plaintiff's action based on corporate negligence in failing to obtain informed consent before administering a blood transfusion to plaintiff's husband, a Jehovah's Witness AIDS patient who had requested that he receive no blood products, where plaintiff offered no expert testimony as to the standard of care utilized by health care facilities like defendant in Winston-Salem or similar communities when obtaining a patient's informed consent to a blood transfusion under any circumstances, much less the circumstances of this case when a blood transfusion was given pursuant to a physician's order to a terminally ill patient whose hemoglobin dropped

CLARK v. PERRY

[114 N.C. App. 297 (1994)]

to a dangerous level while he was unconscious or asleep following surgery.

**Am Jur 2d, Hospitals and Asylums §§ 14 et seq.**

**Necessity of expert evidence to support action against hospital for injury to or death of patient. 40 ALR3d 515.**

6. **Negligence § 6 (NCI4th)— Jehovah's Witness—blood transfusion—negligent infliction of emotional distress—insufficient evidence**

Plaintiff failed to show that her husband, a Jehovah's Witness AIDS patient, suffered severe emotional distress upon learning that he had received a blood transfusion while he was unconscious or asleep following surgery, and the trial court properly directed verdicts for defendant attending physician and defendant hospital in plaintiff's action for the negligent infliction of emotional distress, where plaintiff's evidence tended to show that, upon learning of the transfusion, her husband became "excited" and "upset," some monitors in his room went off, and he cried; her husband was "very upset or depressed," "dejected, more depressed," "preoccupied," "upset and emotional," and "showed anger which continued until he died" nine days later; and her husband neither exhibited signs of nor reported emotional disturbance to his treating physician. The evidence tended to show only that plaintiff's husband was temporarily upset and was insufficient to show that he suffered from a "severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so."

**Am Jur 2d, Fright, Shock, and Mental Disturbance §§ 45, 53.**

Appeal by plaintiff from directed verdict entered 21 August 1991 by Judge William Z. Wood, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 4 March 1993.

*Herman L. Stephens and Howard C. Jones, III, for plaintiff-appellant.*

*Bell, Davis & Pitt, P.A., by Joseph T. Carruthers, for defendant-appellee Perry.*

*Wilson & Iseman, by G. Gray Wilson, Urs R. Gsteiger, and Elizabeth Horton, for defendant-appellee Forsyth County Hospital, Inc.*

JOHN, Judge.

Plaintiff, administratrix of her late husband's estate, appeals an order directing verdict in favor of defendants Dr. Irvin Perry and Forsyth Memorial Hospital and dismissing her claims of medical negligence (malpractice) and negligent infliction of emotional distress. She also assigns error to numerous evidentiary rulings made by the trial court. We find plaintiff's contentions unpersuasive.

Plaintiff offered evidence tending to show that her late husband, Earnest Clark, Jr. (Clark), was under the medical care of Dr. Romulo Jacinto (Dr. Jacinto) for the ten years preceding Clark's death on 27 September 1986. In November 1985, Clark was baptized into the Jehovah's Witness religious faith, allegedly adhering thereafter to its tenets forbidding the use of blood and blood components. Clark informed Dr. Jacinto of his baptism, giving him a pamphlet entitled "Jehovah's Witnesses and the Question of Blood."

Clark was admitted to Forsyth Memorial Hospital (Forsyth Hospital) several times in 1985 and 1986: 9 August 1985, 30 September 1985, 1 October 1985, and 2 February 1986. Patient evaluation records and admission forms were filled out incident to these admissions, and certain of these documents (kept in Forsyth Hospital's permanent files) indicate Clark's religion as Jehovah's Witness; additionally, during the 9 August 1985 hospital stay, an anesthesiologist's notation in Clark's record specified he was not to receive blood products.

On 14 September 1986, Dr. Jacinto admitted Clark to Forsyth Hospital as the result of complications associated with acquired immune deficiency syndrome (AIDS). These included right upper lobe pneumonia, congestive heart failure, blood clots, skin problems, shortness of breath, and fever. Before this admission, Dr. Jacinto was personally reminded by Clark of his conversion to the Jehovah's Witness faith. On the day of admission, plaintiff similarly informed the admitting office of Forsyth Hospital and the nurse checking Clark into his room. Clark's patient evaluation record from 14 September 1986 and his identification bracelet carried the notation "Jehovah's Witness," and Dr. Jacinto testified the outside of the

medical chart taken to Clark's hospital room from admissions bore a red label marked with "Jehovah's Witness" and "No Blood."

Dr. Jacinto related that Forsyth Hospital's unit secretaries bore the responsibility of transferring a patient's chart from one area of the hospital to another, although he was unable to detail a particular manner in which this task was always to be accomplished.

Upon Clark's 14 September admission, Dr. Jacinto called in Dr. Irvin Perry (Dr. Perry), a specialist in internal medicine and pulmonary diseases, for consultation. Dr. Perry "reviewed current and old records" and, after examining Clark, decided to perform first a Swan-Ganz catheterization and then a fibrotic bronchoscopy to relieve some of Clark's respiratory problems. On cross-examination, Dr. Jacinto revealed he spoke with Clark about what each procedure entailed, and testified Clark thereafter stated "whatever it takes to help him (Clark), to make him more comfortable for him to breathe better . . . should be done," and "if blood was needed, it was okay." Plaintiff signed consent forms authorizing the procedures to be performed by Dr. Perry. Plaintiff testified she also requested and signed a document releasing the hospital from liability in the event of her husband's death, stating that she did not want him to receive a blood transfusion and that there was "reference on the form to blood transfusion."

Following the bronchoscopy, Clark was transferred from the operating room to the Intensive Care Unit (ICU). Upon being notified by telephone that Clark's hemoglobin level had dropped precariously low, Dr. Perry ordered that Clark receive a blood transfusion. Clark was either asleep or unconscious, and unaware the transfusion had taken place. Shortly thereafter, plaintiff entered the ICU to visit her husband. She woke him, and as the two were talking, a nurse brought an additional pint of blood into the room and prepared to administer a second transfusion to Clark. When plaintiff determined what was taking place, she insisted her husband did not want to receive any blood products because he was a practicing Jehovah's Witness. No further blood was administered. Within moments, the ICU head nurse called plaintiff from Clark's room, whereupon she apologized for the oversight and also showed plaintiff where she had subsequently marked Clark's chart with his Jehovah's Witness status to prevent any recurrence. In the interim, plaintiff related to her husband what had transpired. She testified that upon learning of the transfusion, Clark became excited and

upset, some "machines and things started going off" (including the "beeping of the heart machine"), and he cried in front of plaintiff for the first time in their eighteen years of marriage. However, the head nurse related plaintiff said "he was not upset and she was not upset and he was not that devout anyway."

Clark died from complications associated with the AIDS virus on 27 September 1986. Plaintiff and others testified that during his last nine days of life, Clark was upset and distraught about having been given a blood transfusion. Joseph Mitchell, a minister of the faith, explained that Jehovah's Witnesses refuse blood transfusions based upon biblical commands. Reginald Stocks, a minister in Clark's congregation, professed the depth and sincerity of Clark's religious convictions. Stocks saw Clark seven times between the date of the transfusion and the time of death, and observed on each occasion that Clark appeared preoccupied with the effects of having been given blood. Despite Stocks' temporarily successful efforts to reassure Clark, the latter remained concerned, seeming "very, very upset," "dejected," and "depressed" on each subsequent visit. Plaintiff offered testimony to the effect that her husband was "upset," "really upset," "emotional," demonstrated an "angriness," and, in fact, was desirous of suing Dr. Perry and Forsyth Hospital for violating his rights by defiling his blood. Yet Dr. Jacinto, who remained Clark's primary physician for the last nine days of his life, testified neither Clark nor plaintiff mentioned the blood transfusion to him. Moreover, Dr. Jacinto's daily notes about his patient lacked any indication Clark was experiencing unusual emotional difficulty at that time and reflected Clark was contemplating taking the drug AZT to prolong his life.

On behalf of her late husband's estate, plaintiff filed suit on 5 October 1989 against Dr. Jacinto, Dr. Perry, and Forsyth Hospital. Plaintiff voluntarily dismissed her action against Dr. Jacinto on 4 September 1990.

At trial on 21 August 1991, both defendants moved at the close of plaintiff's evidence for directed verdict pursuant to Rule 50 of the North Carolina Rules of Civil Procedure. The trial court allowed the motions of both defendants. Announcing his decision, the judge stated:

I cannot find severe emotional distress from the evidence that we've got.

CLARK v. PERRY

[114 N.C. App. 297 (1994)]

Furthermore, I can't find proximate cause from the evidence that you bought [sic] out from Jehovah's Witnesses. All the Jehovah's Witnesses have said that the decedent was not in any blame-worthy position from his religious standpoint in any way at all . . . . So, that removes proximate cause.

Finally, as to the negligence of the doctor, there is no evidence that Dr. Perry knew anything about Mr. Clark being a Jehovah's Witness.

As to the negligence of the hospital, there certainly is evidence that there was a sticker on the front of his chart before he went to the intensive care unit showing no blood. But that's the only evidence. And there is no evidence that that sticker ever got to the intensive care unit. There is some evidence that the — on occasion, the contents of the charts were removed from that metal clipboard and carried upstairs with a rubber band wrapped around them.

And you don't have anything showing . . . the people in the intensive care unit were ever placed on — nurses in intensive care units were ever placed on notice that this man was a Jehovah's Witness until after the blood — one unit of blood had been given and at that point was stopped immediately.

## I. MEDICAL NEGLIGENCE (MALPRACTICE)

Plaintiff's complaint asserted two allegations of negligence against the "defendants" as follows: 1) breach of the "duty to exercise resonable [sic] care and diligence in the application of their knowledge and skill to [Clark's] care"; and 2) breach of a "duty not to perform any transfusions into his body without his consent" or that of an authorized person. Both defendants contended at the directed verdict hearing, *inter alia*, that plaintiff had put forth no evidence of the standard of care each owed to Clark.

In considering a motion for directed verdict, the task of the trial court is to determine whether the evidence, viewed in the light most favorable to the non-movant, is sufficient to submit the case to the jury. *Southern Bell Telephone and Telegraph Co. v. West*, 100 N.C. App. 668, 670, 397 S.E.2d 765, 766 (1990) (citations omitted), *aff'd per curiam*, 328 N.C. 566, 402 S.E.2d 409 (1991). Evidence of medical negligence or malpractice adequate to withstand a motion for directed verdict must establish each of the

following elements: "(1) the standard of care [duty owed]; (2) breach of the standard of care; (3) proximate causation; and (4) damages." *Lowery v. Newton*, 52 N.C. App. 234, 237, 278 S.E.2d 566, 570 *disc. review denied*, 303 N.C. 711, *and reconsider'n of denial of disc. review denied*, 304 N.C. 195, 291 S.E.2d 148 (1981). Failure to make a *prima facie* evidentiary showing in support of even one element is fatal. *Id.; see also Hong v. George Goodyear Co.*, 63 N.C. App. 741, 742-43, 306 S.E.2d 157, 159 (1983).

This Court has described the standard of care applicable to health care providers in medical malpractice actions as follows:

> [T]he physician is required to (1) possess the degree of professional learning, skill, and ability possessed by others with similar training and experience situated in the same or similar communities at the time of the alleged negligent act; (2) exercise reasonable care and diligence, in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged negligent act, in the application of his knowledge and skill to the patient's case; and (3) use his best judgment in the treatment and care of his patient.

*Bailey v. Jones*, 112 N.C. App. 380, 386, 435 S.E.2d 787, 791 (1993); *see also* N.C. Gen. Stat. § 90-21.12 (1993). Failure of a physician to comply with any one of these duties is negligence. *Bailey*, 112 N.C App. at 386, 435 S.E.2d at 791-92 (citation omitted).

Additionally, a health care provider is ordinarily required to obtain the informed consent of a patient to procedures and treatment rendered. *McPherson v. Ellis*, 305 N.C. 266, 270, 287 S.E.2d 892, 895 (1982). "[T]he standard required of health care providers in obtaining the consent of [a] patient," *Nelson v. Patrick*, 58 N.C. App. 546, 549, 293 S.E.2d 829, 831 (1982), *appeal upon remand*, 73 N.C. App. 1, 326 S.E.2d 45 (1985), is established by statute as being "in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities . . . ." N.C. Gen. Stat. § 90-21.13(a)(1) (1993); *see also Foard v. Jarman*, 326 N.C. 24, 26-27, 387 S.E.2d 162, 164 (1990).

The standard of care required of a health care provider in a particular case generally concerns specialized knowledge and is

thus unfamiliar to most laypersons. *See, e.g., Mazza v. Huffaker,* 61 N.C. App. 170, 175, 300 S.E.2d 833, 837 (citation omitted), *disc. review denied,* 309 N.C. 192, 305 S.E.2d 734 (1983), *reconsider'n denied,* 313 S.E.2d 160 (1984). Consequently, our courts have consistently held that in the usual medical malpractice or medical negligence case, testimony of a qualified expert is required to establish the standard of care. *Tice v. Hall,* 63 N.C. App. 27, 28, 303 S.E.2d 832, 833 (1983), *aff'd,* 310 N.C. 589, 313 S.E.2d 565 (1984); *Beaver v. Hancock,* 72 N.C. App. 306, 311, 324 S.E.2d 294, 298 (1985) (citation omitted).

Likewise, regarding actions based upon a health care provider's failure to obtain informed consent, this Court has concluded G.S. § 90-21.13(a)(1) requires the use of expert medical testimony by the party seeking to establish the standard of care. *Nelson,* 58 N.C. App. at 549-50, 293 S.E.2d at 831-32. Thus, an expert must testify as to what information concerning the particular treatments or procedures, their inherent hazards and risks, is customarily provided by other members of the same health care profession, with similar training and experience, situated in the same or similar communities. *Nelson,* 73 N.C. App. at 11, 326 S.E.2d at 51-52.

## A. Dr. Perry

### 1. Failure to Exercise Reasonable Care and Diligence

[1] Plaintiff correctly states that "[i]t has never been the rule in this State . . . that expert testimony is needed in *all* medical malpractice cases to establish . . . the standard of care." *Smithers v. Collins,* 52 N.C. App. 255, 260, 278 S.E.2d 286, 289, *disc. review denied,* 303 N.C. 546, 281 S.E.2d 394 (1981). However, we disagree with the subsequent assertion in plaintiff's brief that the current case is one wherein "the result is so inconsistent with normal care" that " 'the judgment of the reasonableness of what the doctor has done is clearly within the competence of the layman . . . .' " *Hyder v. Weilbaecher,* 54 N.C. App. 287, 292, 283 S.E.2d 426, 429 (1981) (quoting Robert G. Byrd, *Proof of Negligence in North Carolina,* 48 N.C.L. Rev. 452, 465 (1970) ), *disc. review denied,* 304 N.C. 727, 288 S.E.2d 804 (1982).

In the circumstances before us, the cases to which plaintiff directs our attention are not applicable; the factual scenarios therein "manifest . . . obvious lack of skill and care" on the part of the defendant physicians, *Hyder,* 54 N.C. App. at 289, 283 S.E.2d at

428, to the extent of allowing the affected plaintiffs to proceed under the doctrine of *res ipsa loquitur. See, e.g., Tice,* 63 N.C. App. at 29-30, 37, 303 S.E.2d at 833-34, 838 (surgeon left sponge in patient's body after operating); *Hyder,* 54 N.C. App. at 288-89, 283 S.E.2d at 427-28 (physician left stainless steel wire in patient following surgery).

Despite plaintiff's assertions to the contrary, what constituted or would have constituted "reasonable care and diligence" in the treatment of Clark by Dr. Perry in this case is not readily apparent to a layperson. *See, e.g., Bailey,* 112 N.C. App. at 388, 435 S.E.2d at 792. How meticulously a consulting physician must pore through the medical records of a patient prior to performing a Swan-Ganz catheterization or a bronchoscopy is not a matter of common knowledge; nor is the course a surgeon should take when a dying AIDS patient, who happens to be a Jehovah's Witness, is asleep or unconscious following surgery, and his hemoglobin level drops substantially. Accordingly, we hold it was incumbent upon plaintiff to establish by expert testimony the applicable standards of care in order successfully to proceed under the theory that Dr. Perry failed to exercise reasonable care and diligence, *in accordance with those standards of practice,* when applying his knowledge and skill to Clark's case. *See id.* at 386, 435 S.E.2d at 791-92.

Plaintiff alternatively maintains the requirement of expert testimony, if applicable to this case, was satisfied by Dr. Perry's own deposition testimony. In this context, she highlights the doctor's opinion that a patient's admitting physician (in this instance, Dr. Jacinto) bears the responsibility of writing up orders for the nurses on duty and of indicating if the patient is a Jehovah's Witness who wants no blood products; thereafter, the chart should be labelled appropriately by whatever nurse is on duty. When asked, "Are you saying that in your opinion, the standards of care as the physician in this medical community should follow?", Dr. Perry responded, "Yes." However, that statement refers only to the procedure an *admitting* physician should follow upon a patient's admission to the hospital, not an *attending* physician several days into a patient's hospital stay. Furthermore, we find the question posed (at least as recorded in the transcript) is meaningless both as written and in context, and it is impossible to assign any significance to Dr. Perry's response. Moreover, although at one point he was specifically asked, "with regard to an *attending physician* having prior knowledge of patients' religious preference, do you have an

opinion as to what that physician's responsibility would be with regard to seeing that the chart's appropriately marked?", Dr. Perry answered simply, "It should have been marked with the admission orders."

Plaintiff also points to Dr. Perry's testimony detailing his standard practice when seeing a patient at the hospital. This customarily included first reviewing a patient's hospital chart and, among other things, observing any notations regarding a patient's religious status. Although he could not remember specifically at what moment or in what location he examined Clark's chart, Dr. Perry was certain he had done so and that at that time there was no red label on its front cover. He denied ever having been made aware Clark was a Jehovah's Witness. Had he learned this, Dr. Perry acknowledged he would not have ordered the transfusion given "until [he] had discussed it with [the] patient and/or family." If Clark had refused treatment after such discussion, Dr. Perry said he would not have ordered a blood transfusion, because a patient "has the right, if he's competent, to refuse any care."

Plaintiff insists this testimony, coupled with Dr. Perry's failure to ascertain Clark's Jehovah's Witness status, established the requisite standard of care, and further demonstrated Dr. Perry's violation of it. However, Dr. Perry's deposition testimony referred only to *his* routine practice with respect to a patient's religious beliefs. It is undisputed that the record does not reflect Dr. Perry ever being told about Clark's religious status by anyone, and plaintiff provided no evidence Dr. Perry actually saw a "Jehovah's Witness" ·or "No Blood" label on the chart or any notation to that effect in Clark's records. Thus, as the trial court remarked, plaintiff's evidence failed to show Dr. Perry *knew* of Clark's wish not to undergo a blood transfusion.

In addition to alleging Dr. Perry actually "knew" of Clark's Jehovah's Witness faith, plaintiff also stated in her complaint that Dr. Perry breached his duty to Clark because the doctor "to [sic] the very least *in the exercise of reasonable care should have known,* that he was a Jehovah's Witness . . . ." (Emphasis added). Yet neither Dr. Perry's deposition testimony, nor any of plaintiff's evidence, provided the necessary insight into how, "in the exercise of reasonable care," Dr. Perry should have acquired this information. A lay jury should not be confronted with the task of determining how thorough a consulting or attending physician's review of

a patient's records and documents must be before ordering the administration of a blood transfusion in a "life-threatening," emergency situation.

We hold expert testimony was necessary to establish whether or not Dr. Perry "exercise[d] reasonable care and diligence, in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged negligent act, in the application of his knowledge and skill to [Clark's] case." *Bailey*, 112 N.C. App. at 386, 435 S.E.2d at 791. In the absence of such testimony, plaintiff's claim against Dr. Perry based upon his alleged failure to exercise reasonable care and diligence lacked *prima facie* evidence of an essential element. *See Hong*, 63 N.C. App. at 742-43, 306 S.E.2d at 159. Therefore, the trial court properly directed verdict against her on that claim.

### 2. Failure to Obtain Informed Consent

[2] Plaintiff's second allegation of negligence against Dr. Perry asserted he breached the "duty not to perform any transfusions into [Clark's] body without his consent or that of another authorized to give his consent for him." However, plaintiff again produced no appropriate evidence of the applicable standard of care.

In his deposition, Dr. Perry indicated that had he known Clark was a Jehovah's Witness, he "would first have explained to him the consequences, the possible consequences of not taking [a transfusion]. And I would not have [ordered it] because he has the right, if he's competent, to refuse any care." When asked, "Do you have an opinion as to whether or not that practice is consistent with the standards of practice among members of your health care profession with similar training and experience as yours in this community, Forsyth County?", Dr. Perry simply replied, "It's my opinion—is it—."

Assuming *arguendo* the foregoing vague response may accurately be considered affirmative, it in no way set forth the standard of care for obtaining informed consent in the circumstances of this case. Significantly, the testimony presupposed knowledge of a patient's religious status, and recited Dr. Perry's practice when informed a patient is a Jehovah's Witness, desirous of receiving no blood products. His comments concerned only his method of interacting with patients. *See Estrada v. Jaques*, 70 N.C. App.

627, 648, 321 S.E.2d 240, 253 (1984) (Deposition testimony of surgeons "described generally their usual procedure [in obtaining informed consent], but did not attempt to relate it to any standard professional practice.").

Moreover, even if Dr. Perry had a duty to obtain Clark's informed consent before ordering a blood transfusion administered to him, plaintiff's evidentiary showing with respect to that alleged duty was insufficient. She offered *no* evidence, from any source, regarding what such a duty would have involved. In particular, plaintiff presented no expert testimony tending to show whether Dr. Perry's actions were "in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities." G.S. § 90-21.13(a)(1). There was no showing of what information about blood transfusions and their "usual and most frequent risks and hazards," G.S. § 90-21.13(a)(2), would be, under the circumstances confronted by Dr. Perry, "customarily provided by other members of the same health care profession with similar training and experience situated in the same or similar communities . . . ." *Nelson*, 73 N.C. App. at 11, 326 S.E.2d at 51-52. A lay jury should not be left to speculate on the nature of a physician's duty to obtain "informed consent" when the hemoglobin level of a dying AIDS patient drops substantially while he is unconscious or asleep and recuperating from surgery. Thus, as plaintiff did not meet her evidentiary burden with respect to the standard of care element of her negligence allegation against Dr. Perry based upon failure to obtain informed consent, we hold the trial court properly allowed the motion for directed verdict thereon.

[3]    In this context, plaintiff also assigns as error the trial court's exclusion of Dr. Jacinto's opinion that it was the "consensus" of the "medical community" that a patient who is competent can refuse treatment (including blood transfusions) and that he was unaware of anyone in the same or similar communities having a different opinion. The court's ruling was based upon plaintiff's failure in discovery to designate Dr. Jacinto as an expert witness regarding the standard of care, *see* N.C.R. Civ. P. 26(f1)(2) (1990), and we find no abuse of discretion in the court's choice of sanction. We also observe that testimony about "consensus of the medical community" would not constitute the equivalent of evidence as to the "standards of practice among members of the same health care profession with similar training and experience situated in the same

or similar communities at the time of the alleged act giving rise to the cause of action." G.S. § 90-21.12; *Estrada*, 70 N.C. App. at 648, 311 S.E.2d at 253 (Surgeons' depositions did not establish the standard of care in obtaining a patient's informed consent, in part because they failed to address the standards of practice among members of the same health care profession.). Our determination of the propriety of a directed verdict against plaintiff would therefore be unaffected even had the excluded testimony been permitted.

In her appellate brief, plaintiff also argues it was error to direct verdict in favor of Dr. Perry on the additional ground he failed to use his best judgment in Clark's treatment. However, as we find nothing in the record which would indicate that this theory of liability was asserted in plaintiff's complaint or before the trial court, this matter is not properly preserved for our consideration, and we decline to address it. *Henderson v. LeBauer*, 101 N.C. App. 255, 263-64, 399 S.E.2d 142, 147, *disc. review denied*, 328 N.C. 731, 404 S.E.2d 868 (1991). Nonetheless, we observe that although Dr. Perry's deposition testimony adequately presented his concept of the exercise of his best judgment in dealing with a Jehovah's Witness patient, no evidence shows he knew of Clark's faith or that his conduct in this instance in some way violated the personal standards he enunciated.

## B. Forsyth Memorial Hospital

As with Dr. Perry, plaintiff contends Forsyth Hospital breached its duty to Clark by: 1) "failing to exercise reasonable care and diligence to comply with Earnest Clark, Jr's. [sic] instructions ...," and 2) "causing a blood tranfusion [sic] to be given to Earnest Clark, Jr. without having obtained any consent thereto." However, because plaintiff failed to establish the applicable standard of care owed to Clark by Forsyth Hospital under either theory, we hold the trial court properly granted the hospital's directed verdict motion.

A plaintiff in a medical malpractice action may proceed against a hospital (defined by statute as a "health care provider," *see* N.C. Gen. Stat. § 90-21.11 (1993) ), under two separate and distinct theories, *Bost v. Riley*, 44 N.C. App. 638, 645-47, 262 S.E.2d 391, 395-96, *disc. review denied*, 300 N.C. 194, 269 S.E.2d 621 (1980)—*respondeat superior* (charging it with vicarious liability for the negligence of its employees, servants or agents), or *corporate negligence* (charging the hospital with liability for its employees' violations of duties

owed directly from the hospital to the patient). *Id.* at 645, 262 S.E.2d at 395. Regrettably, plaintiff's argument with respect to the liability of Forsyth Hospital is not a model of clarity; she appears to borrow and confuse notions derived from both theories. However, we understand her first allegation of negligence to refer primarily to the hospital's accountability for the negligent acts of its employees (*respondeat superior*), while her second appears to be grounded in the doctrine of corporate negligence.

We also note plaintiff's allegations against the hospital were directed at nursing and clerical personnel, and that at no time has she contended the actions of either Dr. Perry or Dr. Jacinto were attributable to the hospital.

### 1. Failure to Exercise Reasonable Care and Diligence

[4] Plaintiff argues Forsyth Hospital failed to exercise reasonable care and diligence by (1) administering a transfusion to Clark despite its knowledge he was a Jehovah's Witness, and (2) by not properly maintaining his medical chart.

However, plaintiff offered no expert testimony tending to show the actions undertaken by the hospital's employees in administering a blood transfusion were contrary to a standard of care followed among health care facilities of this type situated in Winston-Salem, North Carolina or similar communities. *See Tripp v. Pate*, 49 N.C. App. 329, 333, 271 S.E.2d 407, 409-10 (1980) ("In order to withstand a motion for directed verdict . . . , plaintiff [is] required by N.C. Gen. Stat. § 90-21.12 . . . to offer some evidence that the care of the defendant hospital was not in accordance with the standards of practice among *other hospitals* in the same or similar communities.").

· Plaintiff nonetheless impliedly asserts again this is a case wherein expert testimony was not required because a jury, by reference to common knowledge and experience, would have been able to understand and to judge the actions of the hospital's employees. *See, e.g., Powell v. Shull*, 58 N.C. App. 68, 71, 293 S.E.2d 259, 261 (citations omitted), *disc. review denied*, 306 N.C. 743, 295 S.E.2d 479 (1982). We disagree.

Plaintiff's argument rests upon the assumption that the duty of Forsyth Hospital (the standard of care) regarding administration of a blood transfusion under the circumstances of the case *sub judice* is governed exclusively by reference to a patient's religious

beliefs, or by the label on his medical chart reflecting those beliefs. However, nothing of record supports this assumption, and a lay jury should not be placed in the position of attempting to intuit the proper procedure for hospital employees to follow when confronted with the emergency occurrence presented by the instant case, or of deciding without evidentiary basis whether, in obeying physician orders, Forsyth Hospital's nursing staff adhered to that procedure. Indeed, based upon Dr. Jacinto's testimony that had Clark not received a transfusion, his life could have been endangered, it arguably may have constituted malpractice for the hospital's nurses *not* to have followed Dr. Perry's order to administer the transfusion to Clark. *See, e.g., Burns v. Forsyth Co. Hospital Authority*, 81 N.C. App. 556, 563, 344 S.E.2d 839, 845 (1986) (under doctrine of corporate negligence, hospital has a duty to obey instructions of a patient's physician, so long as the instructions are not obviously negligent or dangerous); *Byrd v. Hospital*, 202 N.C. 337, 341, 162 S.E. 738, 740 (1932).

As the course which Forsyth Hospital's employees should have followed in this case is not self-evident, it was plaintiff's burden to establish, by expert testimony, whether Forsyth Hospital's employees exercised reasonable care and diligence with respect to each allegation of negligence, *in accordance with the standards of practice customarily followed by hospitals in Winston-Salem, North Carolina or similar communities*, in the application of their knowledge and skill to the circumstances of Clark's case. *Bailey*, 112 N.C. App. at 386, 435 S.E.2d at 791 (emphasis added).

If such evidence was required, plaintiff responds, then the deposition testimony of Nurse Luann Andrews (head nurse of Forsyth Hospital's ICU) adequately showed the hospital's standard of care in administering a blood transfusion. Nurse Andrews testified (*not* as an expert witness) that upon learning a patient is a Jehovah's Witness, her instructions were to "[n]otify the physician and flag the chart and the cardex." While the routine practice of Forsyth Hospital was thus presented, Nurse Andrews shed no light whatsoever on whether that practice was in accordance with the standard of care applicable to other hospitals in the same or similar communities. *See Tripp*, 49 N.C. App. at 333, 271 S.E.2d at 409-10.

Regarding plaintiff's contention Clark's medical chart was not properly maintained, her evidence included certain forms and records from Forsyth Hospital's permanent files which undeniably reflected

Clark's faith as Jehovah's Witness. These tended to show that at various points in Clark's extensive treatment history, some employees of the hospital knew of his wish not to receive blood products. Plaintiff also offered the deposition and trial testimony of several individuals (Dr. Jacinto, Dr. Perry, Nurse Andrews) indicating their understanding about how and by whom a patient's chart should be labelled with his religious persuasion, and how the chart is transported to various sections of the hospital as the patient is moved. However, plaintiff presented no expert testimony to the effect that a patient's religious status or expressed wishes play any role in determining a *hospital's* standard of care in circumstances such as these (again, Dr. Perry testified only as to *his* manner of dealing with individuals having treatment preferences). Thus, plaintiff failed to draw a necessary nexus between Forsyth Hospital's alleged knowledge (as previously reflected in his medical records) that Clark was a Jehovah's Witness, and any failure on the part of its employees to exercise reasonable care and diligence in the maintenance of his hospital chart. *See Bailey*, 112 N.C. App. at 386, 435 S.E.2d at 791.

Moreover, plaintiff's appellate brief is equally deficient in this regard; she cites not a single authority directly supporting her arguments concerning the alleged duty of Forsyth Hospital to maintain the medical charts of its patients. *See* N.C.R. App. P. 28(b)(5); *see also, e.g., Brown v. Boney*, 41 N.C. App. 636, 647, 255 S.E.2d 784, 791, *disc. review denied*, 298 N.C. 294, 259 S.E.2d 910 (1979). Therefore, we need not address further this portion of plaintiff's assignment of error relating to Forsyth Hospital's motion for directed verdict. *See, e.g., Byrne v. Bordeaux*, 85 N.C. App. 262, 265, 354 S.E.2d 277, 279 (1987) (citation omitted).

Accordingly, we hold plaintiff did not meet her evidentiary burden with respect to the standard of care element of this particular allegation, and the trial court properly allowed the hospital's directed verdict motion addressed thereto.

### 2. Failure to Obtain Informed Consent

[5] Plaintiff also alleged in her complaint that Forsyth Hospital breached its duty of care by "causing a blood tranfusion [sic] to be given to Earnest Clark, Jr. without having obtained any consent thereto." In her appellate brief, she characterizes her position somewhat differently, arguing Forsyth Hospital breached its duty to Clark by "ignor[ing] the restrictions on the consent for Dr. Perry's

procedures given by plaintiff when she insisted on signing the release form . . . ." Assuming such contention is preserved for our review, see, e.g., Gilbert v. Thomas, 64 N.C. App. 582, 584, 586, 307 S.E.2d 853, 855, 856 (1983), and regardless of the language used by plaintiff to identify Forsyth Hospital's alleged breach of the standard of care, the duty with which she charges the hospital is one owed directly from the hospital to the patient (i.e., she is proceeding under a theory of corporate negligence).

We first note plaintiff has failed to offer any authority in support of this contention, see N.C.R. App. P. 28(b)(5), entitling us to disregard this assignment of error. Byrne, 85 N.C. App. at 265, 354 S.E.2d at 279. Nevertheless, pursuant to the powers reserved to us in N.C.R. App. P. 2, we elect to examine plaintiff's argument briefly.

While it is the rule that a hospital is generally required to make a "reasonable effort to monitor and oversee the treatment" a physician provides, Bost, 44 N.C. App. at 647, 262 S.E.2d at 396, this Court has not as yet carved from that broad general obligation the specific duty plaintiff herein asserts. Cox v. Haworth, 54 N.C. App. 328, 332-33, 283 S.E.2d 392, 395-96 (1981). Moreover, we have expressly declined to extend the doctrine of corporate negligence in order to impose upon a hospital the duty to obtain a patient's informed consent before treatment when, as here, the patient is admitted by a private physician for surgery. Id. (the role of the hospital is to provide facilities and support personnel for the physician); see also Johnson v. Sears, Roebuck & Co., 832 P.2d 797, 799 (N.M. App. 1992) (majority rule is that "hospitals have no duty to obtain informed consent for a procedure ordered by a non-employee physician and performed by hospital employees"), cert. denied, 832 P.2d 1223 (N.M. 1992); contra Campbell v. Pitt County Memorial Hosp., 84 N.C. App. 314, 352 S.E.2d 902, aff'd, 321 N.C. 260, 265-66, 362 S.E.2d 273, 276 (1987) (Court of Appeals opinion wherein one judge concurred only in result on issue of informed consent and one judge dissented; affirmed by evenly divided Supreme Court expressly stating decision is without precedential authority) (emphasis added), overruled in part on other grounds, Johnson v. Ruark Obstetrics, 327 N.C. 283, 395 S.E.2d 85, reh'g denied, 327 N.C. 644, 399 S.E.2d 133 (1990).

In any event, in actions for medical malpractice or negligence based on a health care provider's failure to obtain informed consent,

CLARK v. PERRY

[114 N.C. App. 297 (1994)]

this Court has held G.S. § 90-21.13(a)(1) requires the use of expert medical testimony by the party seeking to establish the standard of care. *Nelson*, 58 N.C. App. at 549-50, 293 S.E.2d at 831-32. Plaintiff produced *no* evidence about the standard of care utilized by health care facilities like Forsyth Hospital, located in Winston-Salem, North Carolina or similar communities, when obtaining a patient's informed consent to a blood transfusion under *any* circumstances, much less the circumstances of this case—where a terminally ill patient is unconscious (or asleep) following surgery, and his hemoglobin drops to a life-threatening level.

We therefore hold plaintiff's failure to present *prima facie* evidence of the standard of care applicable to Forsyth Hospital in obtaining Clark's informed consent to undergo a blood transfusion was fatal to this claim against defendant Forsyth Hospital. *See, e.g., Hong*, 63 N.C. App. at 742-43, 306 S.E.2d at 159. Therefore, the trial court's allowance of a directed verdict thereon was proper.

We note also that in her appellate brief and in addition to the allegations set forth in her pleadings, plaintiff asserts that Forsyth Hospital's staff "failed to exercise its best judgment in administering the blood transfusion to Clark without bringing his religion and no blood instructions to the attention of Dr. Perry." However, as plaintiff failed to include this theory in her complaint or to argue it at trial, it is not properly presented to us for consideration. "In passing upon a trial judge's ruling as to a directed verdict, we cannot review the case as the parties might have tried it; rather, we must review the case as tried below, as reflected in the record on appeal." *Tallent v. Blake*, 57 N.C. App. 249, 252, 291 S.E.2d 336, 339 (1982) (citation omitted).

II.

[6] The trial court directed a verdict in favor of both defendants on plaintiff's claim for negligent infliction of emotional distress. The court observed plaintiff established neither "severe emotional distress" nor proximate cause between defendants' actions or inactions and whatever distress Clark may actually have suffered.

While "emotional distress, standing alone, is an actual and compensable injury," *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 299, 395 S.E.2d 85, 94, *reh'g denied*, 327 N.C. 644, 399 S.E.2d 133 (1990), plaintiff cannot recover without proving *severe* emotional distress, as opposed to "mere fright or temporary anxiety." *Id.*

CLARK v. PERRY

[114 N.C. App. 297 (1994)]

at 303-04, 395 S.E.2d at 97. Our Supreme Court has defined "severe emotional distress" as follows:

> any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, *or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.*

*Id.* at 304, 395 S.E.2d at 97 (emphasis added).

In the recent case of *Waddle v. Sparks,* 331 N.C. 73, 414 S.E.2d 22 (1992), the Court, after acknowledging that *Johnson v. Ruark Obstetrics* enunciated "a high standard of proof on the severe emotional distress element," adopted the same for cases involving intentional infliction of emotional distress. *Id.* at 83, 414 S.E.2d at 27. The Court cited with approval the following discussion of emotional distress:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. *It is only where it is extreme that the liability arises. . . . The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.* The intensity and the duration of the distress are factors to be considered in determining its severity. . . . It is for the court to determine whether on the evidence severe emotional distress can be found . . . .

*Id.* at 84, 414 S.E.2d at 27-28 (quoting Restatement (Second) of Torts § 46, Comment j., at 77-78 (1965)).

In the case *sub judice,* plaintiff's evidence, taken in the light most favorable to her, failed to show Clark suffered the requisite degree of emotional distress necessary to maintain plaintiff's cause of action. Clark lived but nine days following the blood transfusion. Upon learning, interestingly from *plaintiff,* that he had been given blood, Clark became "excited" and "upset," some monitors in his room "started going off," and he cried. During the next nine days, he was from time to time "very, very upset or depressed," "dejected, more depressed," "preoccupied," "upset and emotional," and "showed anger which continued until he died." However, he neither exhibited signs of nor reported emotional disturbance to his own

CLARK v. PERRY

[114 N.C. App. 297 (1994)]

treating physician, Dr. Jacinto, when the latter examined him over the course of those days.

Plaintiff maintains a jury reasonably could have concluded Clark suffered severe emotional distress before he died, based upon evidence reflecting his demeanor, emotional state, and concerns. We disagree and affirm the court's grant of directed verdict. The evidence tended at best to show only that Clark was temporarily upset and that he did not suffer anxiety "so severe that no reasonable man could be expected to endure it." *Waddle*, 331 N.C. at 84, 414 S.E.2d at 27-28 (quoting Restatement (Second) of Torts § 46, Comment j., at 77). The adjectives used in describing Clark's state of mind do not, without more, constitute the type of "severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Johnson*, 327 N.C. at 304, 395 S.E.2d at 97. In addition, plaintiff's account was not supported by medical commentary, despite Clark's being situated in a large hospital with a psychiatric staff.

In this context, plaintiff also assigns error to the trial court's exclusion of Reginald Stocks' observation that Clark "was very devastated" about having received a transfusion. Assuming *arguendo* the comment was erroneously excluded, plaintiff has failed to show how she was prejudiced thereby, and we hold any such error to have been harmless. *See* N.C.R. Civ. P. 61 (1990); *see also, e.g., Segrest v. Gillette*, 331 N.C. 97, 103-04, 414 S.E.2d 334, 338, *reh'g denied*, 331 N.C. 386, 417 S.E.2d 791 (1992). First, as related above, identical or extremely similar testimony was otherwise admitted. *United Laboratories, Inc. v. Kuykendall*, 102 N.C. App. 484, 489, 403 S.E.2d 104, 108 (1991), *aff'd*, 335 N.C. 183, 437 S.E.2d 374 (1993); *Williams v. State Farm Mut. Auto. Ins. Co.*, 67 N.C. App. 271, 277-78, 312 S.E.2d 905, 909 (1984). Moreover, Stocks' characterization, even if permitted, would not affect our determination regarding defendants' entitlement to a directed verdict.

As plaintiff did not offer evidence of severe emotional distress, she failed to make out a *prima facie* case of negligent infliction of emotional distress. *Johnson*, 327 N.C. at 304, 395 S.E.2d at 97; *see also Hong*, 63 N.C. App. at 742-43, 306 S.E.2d at 159. Accordingly, we hold the trial court properly granted a directed verdict as to this claim with respect to both defendants, and we decline to address the issue of proximate causation.

## III.

Finally, plaintiff assigns error to several of the court's evidentiary rulings on grounds the court thereby excluded relevant and admissible evidence. The party asserting error "must show from the record not only that the trial court committed error, but that the aggrieved party was prejudiced as a result." *Lawing v. Lawing*, 81 N.C. App. 159, 162, 344 S.E.2d 100, 104 (1986) (citations omitted). Plaintiff has not made such a showing here, and after carefully reviewing each assignment of error, we determine she suffered no prejudice. Even had the excluded testimony been allowed in its entirety by the trial court, its grant of directed verdict would remain proper, and our decision on appeal affirming its action would be unaffected thereby.

Affirmed.

Judges JOHNSON and LEWIS concur.