IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-106

Filed: 5 July 2017

Wayne County, No. 13 CVS 1023

TRACIE JOHNSON, ADMINISTRATOR OF THE ESTATE OF MARIO JOHNSON, Deceased, Plaintiff,

v.

WAYNE MEMORIAL HOSPITAL, INC., TERRY A. GRANT, M.D., IMMEDIATE CARE OF GOLDSBORO, PLLC, GOLDSBORO EMERGENCY MEDICAL SPECIALISTS, INC., DENNIS A. ISENHOWER, P.A., LLOYD SMITH, M.D., PHILIP D. MAYO, M.D., and EASTERN MEDICAL ASSOCIATES, P.A., Defendants.

Appeal by plaintiff from order entered 19 February 2016 by Judge Beecher R. Gray in Wayne County Superior Court. Heard in the Court of Appeals 8 June 2017.

*The Melvin Law Firm, P.A., by R. Bailey Melvin, for plaintiff-appellant.*

*McGuireWoods LLP, by Patrick M. Meacham and Kayla Marshall, for defendant-appellee Wayne Memorial Hospital, Inc.*

ZACHARY, Judge.

Tracie Johnson, Administrator of the Estate of Mario Johnson (plaintiff), appeals from an order granting directed verdict in favor of Wayne Memorial Hospital, Inc. (defendant, hereafter "the hospital") on plaintiff's claim of medical negligence. Plaintiff alleged that the hospital's process for review of X-ray over-read discrepancies did not meet the standard of care for hospitals in the same or similar communities. On appeal, plaintiff contends that the court erred by ruling that plaintiff failed to present competent evidence of the relevant standard of care and by ruling that the

hospital was insulated from liability arising from its allegedly negligent policy for review of X-ray over-read discrepancies by the subsequent intervening negligence of the physicians who treated Mario Johnson (Mr. Johnson) prior to his death. After careful review of plaintiff's arguments in light of the record on appeal and the applicable law, we conclude that the trial court did not err by granting directed verdict for the hospital based on plaintiff's failure to offer competent testimony as to the standard of care or the hospital's breach of that standard. Having affirmed the court's order on this basis, we find it unnecessary to reach plaintiff's other argument.

## I. Factual and Procedural History

At around 3:00 a.m. on 11 February 2011, Mr. Johnson came to the emergency department of the hospital seeking treatment for pain. Mr. Johnson suffered from sickle cell anemia, an inherited blood disorder that affects red blood cells. At the emergency room, Mr. Johnson was treated by Dr. Terry Grant, M.D., who administered pain medication and a saline solution, and ordered various tests for Mr. Johnson, including blood tests, an EKG, a test for influenza, and a chest X-ray. The results of these tests showed that Mr. Johnson's temperature, respiration, blood pressure, and blood oxygen level were normal. The blood test results indicated that Mr. Johnson's white blood cell count was elevated, which can be caused by a variety of medical conditions; however, other blood tests indicated that Mr. Johnson's red blood cells were normal and that he was not showing signs of inflammation. Dr.

Grant's interpretation of the X-ray of Mr. Johnson's chest was that the results were normal. Dr. Grant concluded that because Mr. Johnson "did not appear overtly ill" and that because his "vital signs were normal" he did not need to be admitted to the hospital. Mr. Johnson was discharged from the hospital at around 5:00 a.m., with instructions to return if his condition worsened. Mr. Johnson returned to the hospital on 12 February 2011, at which time health care providers in the emergency room determined that he was suffering from "acute chest syndrome," a life-threatening complication of sickle cell anemia. Mr. Johnson was admitted to the intensive care department of the hospital. Despite further treatment, Mr. Johnson died during the early morning hours of 13 February 2011.

On 11 February 2013, plaintiff filed suit against Wayne Memorial Hospital, Inc.; Dr. Terry Grant; Dr. Paul Willman; Dennis Isenhower, P.A.; Dr. Lloyd Smith; Dr. Philip Mayo; Immediate Care of Goldsboro, PLLC; Goldsboro Emergency Medical Specialists, Inc.; Wayne Radiologists, P.A.; and Eastern Medical Associates, P.A. Dr. Smith, Dr. Mayo, Dr. Willman, and Physician's Assistant Isenhower[1] were health care providers who treated Mr. Johnson on 12 and 13 February 2011. Plaintiff's complaint alleged that (1) all of the individual defendants were agents or employees of the hospital; (2) Dr. Grant was an agent, employee, or owner of Immediate Care of Goldsboro, PLLC, and of Goldsboro Emergency Medical Specialists, Inc.; (3) Dr.

---

[1] The term "PA" refers to a physician's assistant. A PA, although not licensed to practice medicine, has extensive training in providing health care to patients.

- 3 -

Willman was an agent, employee, or owner of Wayne Radiologists, P.A.; (4) PA Isenhower and Dr. Smith were agents or employees of Immediate Care of Goldsboro, PLLC, and of Goldsboro Emergency Medical Specialists, Inc.; and (5) Dr. Mayo was an agent, employee, or owner of Eastern Medical Associates, P.A. Plaintiff sought damages for medical malpractice, based upon the alleged negligence of the individual defendants as well as the derivative liability of the hospital and the medical practices with which plaintiff alleged that the individual defendants were associated. With respect to the individual defendants, plaintiff alleged that each had failed to provide appropriate care to Mr. Johnson or to meet the relevant standard of care and that the individual's negligence was a proximate cause of Mr. Johnson's death. Plaintiff sought damages against the hospital based upon allegations of medical malpractice arising from negligent treatment of Mr. Johnson, together with allegations that the hospital was negligent in that its policy for review of discrepancies between an emergency room physician's interpretation of an X-ray and that of a radiologist did not meet the relevant standard of care. The plaintiff later dismissed all claims against defendants Immediate Care of Goldsboro, PLLC, Dr. Willman, and Wayne Radiologists, P.A.

Plaintiff's claims against the remaining defendants were tried before the trial court and a jury beginning on 25 January 2016. The evidence offered at trial is discussed below, as relevant to the issues raised on appeal. At the close of plaintiff's

evidence, the trial court granted directed verdict in favor of the hospital on plaintiff's allegations that the individual defendants were actual or apparent agents of the hospital, and on plaintiff's claims of clinical malpractice of the hospital arising from the individual health care providers' treatment of Mr. Johnson. The trial court did not dismiss plaintiff's negligence claim against the hospital based on the hospital's process for review of X-ray over-read discrepancies. At the close of all the evidence, however, the trial court granted directed verdict in favor of the hospital on this claim as well. As a result, the only claims submitted to the jury were the allegations of negligence on the part of the individual defendants.

The jury returned verdicts finding that the individual defendants were not negligent. The trial court signed an order on 8 February 2016, which was filed on 8 March 2016, dismissing all of plaintiff's claims with prejudice. On 18 February 2016, plaintiff filed a motion asking the trial court to reconsider its entry of directed verdict in favor of the hospital on plaintiff's claim that the hospital's process for review of X-ray over-read discrepancies did not meet the standard of care. The trial court denied plaintiff's motion on 8 March 2016. On the same day, plaintiff noted an appeal to this Court "from the [trial court's] Order for a Directed Verdict for [the hospital], entered on February 10, 2016[.]" The directed verdict to which plaintiff's notice of appeal refers is the order directing a verdict in favor of the hospital on plaintiff's claim arising from the hospital's policy for review of X-ray over-read discrepancies. Plaintiff

has not appealed from the trial court's order granting directed verdict for the hospital on plaintiff's claim for liability based on agency, from the verdicts finding the individual defendants not negligent, or from the judgment entered by the trial court after the trial. Therefore, the only issue before us on appeal is plaintiff's challenge to the order that effectively dismissed the claim that the hospital was negligent in its X-ray over-read discrepancy review policy.

## II. Standard of Review

Plaintiff has appealed from an order granting directed verdict for the hospital. "The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." *Green v. Freeman*, 367 N.C. 136, 140, 749 S.E.2d 262, 267 (2013) (internal quotation omitted).

> When considering a motion for a directed verdict, a trial court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of every reasonable inference arising from the evidence. Any conflicts and inconsistencies in the evidence must be resolved in favor of the non-moving party. If there is more than a scintilla of evidence supporting each element of the non-moving party's claim, the motion for a directed verdict should be denied. . . . Because the trial court's ruling on a motion for a directed verdict addressing the sufficiency of the evidence presents a question of law, it is reviewed *de novo.*

*Maxwell v. Michael P. Doyle, Inc.*, 164 N.C. App. 319, 322-23, 595 S.E.2d 759, 761 (2004) (citations omitted). "A motion for directed verdict 'tests the legal sufficiency of

the evidence to take the case to the jury and support a verdict' for the nonmovant." *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720, 693 S.E.2d 640, 643 (2009) (quoting *Manganello v. Permastone, Inc.*, 291 N.C. 666, 670, 231 S.E.2d 678, 680 (1977)).

On appeal, plaintiff challenges certain findings of fact made by the trial court in its directed verdict order. "However, this Court, in reviewing trial court rulings on motions for directed verdict and judgment notwithstanding the verdict, has held that the trial court should not make findings of fact, and if the trial court finds facts, they are not binding on the appellate court. . . . [T]hese findings are not binding on the appellate court even if unchallenged by the appellant." *Scarborough*, 363 N.C. at 722-23, 693 S.E.2d at 644 (citation omitted). As a result, our review of the propriety of the trial court's directed verdict order is not dependent upon the evidentiary support for or the legal relevance of the court's findings of fact.

### III. Medical Malpractice Claim Against the Hospital

### A. Legal Principles

In reviewing a trial court's ruling on a motion for directed verdict, "our *de novo* inquiry is whether the evidence, taken in a light most favorable to plaintiff, provides more than a scintilla of evidence to support each element of plaintiff's claim. If that burden is satisfied, the motion for directed verdict should be denied[.]" *Heller v. Somdahl*, 206 N.C. App. 313, 314, 696 S.E.2d 857, 860 (2010) (citation omitted).

"Evidence of medical negligence or malpractice adequate to withstand a motion for directed verdict must establish each of the following elements: '(1) the standard of care [duty owed]; (2) breach of the standard of care; (3) proximate causation; and (4) damages.' Failure to make a *prima facie* evidentiary showing in support of even one element is fatal." *Clark v. Perry*, 114 N.C. App. 297, 304-05, 442 S.E.2d 57, 61 (1994) (quoting *Lowery v. Newton*, 52 N.C. App. 234, 237, 278 S.E.2d 566, 570 (1981) (other citation omitted).

"One of the essential elements of a claim for medical negligence is that the defendant breached the applicable standard of medical care owed to the plaintiff." *Goins v. Puleo*, 350 N.C. 277, 281, 512 S.E.2d 748, 751 (1999). "Plaintiffs must establish the relevant standard of care through expert testimony." *Crocker v. Roethling*, 363 N.C. 140, 142, 675 S.E.2d 625, 628 (2009) (citations omitted). "To meet their burden of proving the applicable standard of care, plaintiffs must satisfy the requirements of N.C.G.S. § 90-21.12[.]" *Id*. At the time that plaintiff's claim arose, [2] N.C. Gen. Stat. § 90-21.12(a) provided that:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical . . . care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of

[2] N.C. Gen. Stat. § 90-21.2 was amended effective 1 October 2011, and "apply[ing] to causes of action arising on or after that date." Because plaintiff's claim arose in February, 2011, it is governed by the earlier version of N.C. Gen. Stat. § 90-21.2.

practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

### B. Discussion

Plaintiff alleges that the hospital was negligent in its process for review by a radiologist of X-rays that were originally interpreted by an emergency room physician and subsequent communication of any discrepancy in the radiologist's interpretation to emergency room personnel. The dispositive issue is whether plaintiff produced evidence that the hospital's policy or practice "was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action[.]" N.C. Gen. Stat. § 90-21.12(a) (2011). We conclude that plaintiff failed to offer any evidence of either (1) the standard of care to which a hospital in the same or similar community should adhere in its process for the review of X-rays, or (2) the hospital's breach of the standard of care.

The hospital policy at issue becomes relevant in the following circumstances. When a patient, such as Mr. Johnson, is treated in the hospital's emergency room, the physician who is treating the patient may order an X-ray. The emergency room physician reviews, or "reads," the X-ray as part of the physician's determination of the appropriate treatment for the patient. The X-ray is later provided to a radiologist,

who is a physician specializing in the interpretation and analysis of X-rays and other scans. The radiologist's review of the X-ray that was originally interpreted by the emergency room physician is referred to as an "over-read." If the radiologist's interpretation of the X-ray differs from that of the emergency room physician, this difference is termed a "discrepancy." Plaintiff alleges that the hospital's process for informing emergency room personnel about a discrepancy observed by the radiologist in the over-read did not meet the applicable standard of care.

The general structure of the hospital's policy at the time of Mr. Johnson's treatment at the hospital in regard to communication about discrepancies detected in a radiologist's over-read is set out in the hospital's Policy Number ED-019, which states, in relevant part, that:

> Purpose: To provide a system for follow up of diagnostic tests. . . . To provide guidelines for contacting patients when additional or alternative treatment is necessary following an Emergency Department visit.
>
> . . .
>
> Policy:
> A. Follow up of diagnostic tests will be done in the Emergency Department under the direction of a physician.
> B. The Emergency Department Supervisor will review all . . . radiologist interpretations[.] . . . Discrepancies will be reported to the Emergency Department physician/PA.
>
> . . .
>
> E. The Emergency Department physician/PA will review the corresponding patient's record to decide whether the

variance is clinically significant and requires contacting the patient, or whether a variance exists, but [is] not clinically relevant to the Emergency Department visit and requires no further treatment.

Radiology:
1. X-rays ordered by an Emergency Department physician or PA are initially interpreted by the Emergency Department physician with final interpretation by a radiologist.

. . .

4. The ED supervisor compares the Emergency Department physician's preliminary findings . . . with the final radiologist interpretation. If a discrepancy exists, the "Emergency Department Radiology Follow-up Form" will be completed.

Plaintiff's negligence claim against the hospital is not based upon a challenge to the general parameters of the hospital's policy for review of discrepancies. Nor does plaintiff allege that the hospital failed to implement its policy in this case. Plaintiff instead contends that that the hospital's negligence "is not based upon the policy itself but on the timeframe established by the hospital to carry out the policy." Thus, plaintiff does not allege that the hospital was negligent for utilizing a sequence of successive reviews by the emergency room physician, the radiologist, a nurse, and then emergency room personnel. Plaintiff's claim is narrowly focused upon the fact that, unless the radiologist determined that the emergency room should be contacted immediately, it typically took about 24 hours after an emergency room physician's

initial read of an X-ray before the emergency room staff would be informed of the radiologist's differing interpretation.

The schedule or timeline of the hospital's process for review of X-ray over-read discrepancies was established through the testimony of Nurse Laura Bruce, the Clinical Director of the hospital's emergency department, and Dr. Paul Willman, the radiologist who reviewed Mr. Johnson's X-ray. Dr. Willman testified that the radiologist would contact the emergency department directly if, in the opinion of the radiologist, the X-ray revealed a life-threatening situation or a medical condition for which a patient required immediate attention. Nurse Bruce described the hospital's process for the further review of X-rays that had been read by an emergency room physician and subsequently reviewed by a radiologist in situations in which the radiologist did not find it necessary to contact the emergency room immediately. Each morning the nurse supervisor reviewed the X-rays that were taken between midnight the day before until midnight of that day. If there was a discrepancy between the X-ray interpretation of the emergency department physician and that of the radiologist, the nurse supervisor would complete a form detailing the situation. The form would then be reviewed by an emergency room PA or physician, who would determine what, if anything, should be done in response to the discrepancy. Thus, if the radiologist did not perceive the need for immediate intervention, it would typically be at least 24 hours between the emergency room physician's initial reading

of an X-ray and the opportunity for a physician to compare that review with the results of the radiologist's reading of the X-ray.

In this case, X-rays were taken between 3:00 and 5:00 a.m. on 11 February 2011, and Mr. Johnson was discharged from the emergency room at around 5:30 a.m. At approximately 8:00 a.m. that morning, Mr. Johnson's X-ray was reviewed by Dr. Paul Willman, a radiologist who practiced at the hospital and testified at trial as an expert in radiology. In February 2011, Dr. Willman's duties included a review each morning of the X-rays taken during the previous night. On 11 February 2011, Dr. Willman reviewed the X-ray of Mr. Johnson's chest and lungs and observed a "very subtle" abnormality, which he characterized as a "left lobe infiltrate." Because Dr. Willman did not consider this finding to be "dangerous, ominous, or concerning," he did not report it directly to the emergency department. The discrepancy was provided to the nurse supervisor about 14 hours later, just after midnight on 12 February 2011. She shared the results with the emergency room PA when he arrived for work on the morning of 12 February 2011. However, Mr. Johnson had already returned to the emergency room during the morning of 12 February 2011, "before it got to [the] stage of the process" in which a PA would conduct further review.

Plaintiff contends that the hospital's process for communication of discrepancies in review of X-rays failed to meet the proper standard of care in regard to the "timeframe" within which such discrepancies should be brought to the

attention of an emergency room physician. Specifically, plaintiff alleges that the hospital breached the standard of care because, unless the radiologist found a discrepancy that appeared to require urgent treatment, it could be 24 hours between the time that an emergency room physician reviewed an X-ray and the time that emergency room personnel received a copy of the radiologist's description of the over-read showing a discrepancy.

In order to meet the standard for recovery enunciated in N.C. Gen. Stat. § 90-21.12, plaintiff was required to establish that the hospital's policy did not meet "the standards of practice among [other hospitals] . . . situated in the same or similar communities at the time of the alleged act giving rise to the cause of action." Accordingly, to establish the standard of care, plaintiff was required to produce evidence showing whether the hospital met the standard of care for similar hospitals in regard to the timely communication of information about over-read discrepancies between the radiologist and the emergency room personnel. This Court held in *Tripp v. Pate*, 49 N.C. App. 329, 333, 271 S.E.2d 407, 409-10 (1980), a case bearing some factual similarity to the present case, that the failure to produce such evidence supported entry of directed verdict in favor of the hospital:

> First, plaintiff argues she presented evidence the hospital was negligent in not reporting promptly the results of certain tests ordered by plaintiff's doctors after her surgery, thereby causing a delay in the diagnosis of plaintiff's condition. In order to withstand a motion for directed verdict on this issue, however, plaintiff was

> required by N.C. Gen. Stat. § 90-21.12, *supra*, to offer some evidence that the care of the defendant hospital was not in accordance with the standards of practice among other hospitals in the same or similar communities. <u>Plaintiff failed to present any evidence of the standard of care for a hospital in Kinston or similar communities regarding time necessary to report test results</u>. (Emphasis added).

In the instant case, plaintiff offered the testimony of Dr. Brian Quigley to establish the standard of care for a hospital's policy for communication of discrepancies found in a radiologist's over-read, and the hospital's breach of that standard. On appeal, the parties have offered arguments as to whether Dr. Quigley was qualified to offer expert testimony on the standard of care for timely communication between the radiologist and the emergency room staff of an X-ray over-read discrepancy. Upon review of the transcript, however, we conclude that Dr. Quigley did not offer testimony establishing either the standard of care or the hospital's breach of the standard. As a result, we find it unnecessary to address the parties' arguments concerning whether he would have been qualified to give such testimony.

Dr. Quigley, who testified as an expert in emergency medicine, testified that he had reviewed information about Goldsboro and about Wayne Memorial Hospital and specifically its emergency room, and was "familiar with the type of policies and procedures that hospitals like Wayne Memorial should have in their emergency room." When asked by plaintiff's counsel, Dr. Quigley agreed that a hospital should

"have a system set up to make sure there's good communication between radiology and emergency medicine when there's this kind of discrepancy between the [physicians' interpretation of X-rays]." Dr. Quigley testified as follows when asked by plaintiff's counsel to "explain the system, the policy that Wayne Memorial had set up regarding these over, over -- X-Ray over-reads and the discrepancies."

> [DR. QUIGLEY]: Well, a discrepancy policy means that there is a discrepancy between . . . an emergency physician's reading versus what the radiologist's is, and from what I understand, the policy was that they collected the X-rays from one midnight to the next midnight, and then they matched up what the radiologist's reading was with what the emergency physician's reading was, and if there was a discrepancy between the two, then they brought those up to the emergency department, they're pulled by the nurse supervisor, and brought up to the emergency department, and then the physician assistant would review these discrepancies, look at the chart, look at the over-read of the radiologist, and then make a determination whether clinically they were of concern, whether or not to call the patient back or have them come back to the emergency department.

Dr. Quigley's testimony reflects a general understanding of the hospital's policy, with one significant omission: Dr. Quigley did not acknowledge that, in the event that the radiologist determined that a discrepancy indicated a medical condition requiring urgent attention, he would contact the emergency room staff directly.

On direct examination, Dr. Quigley indicated that he was generally "familiar with the standard of care in February of 2011 in Goldsboro, North Carolina or similar

communities as it applies to the type of care and treatment that Mario Johnson received." However, when he was questioned specifically about the X-ray over-read discrepancy policies or practices of hospitals in the same or similar communities in 2011, Dr. Quigley conceded that he had no information on the subject:

> Q. Do you agree that Wayne Memorial Hospital followed their discrepancy policy as it was written?
>
> A. As it was written, yes.
>
> . . .
>
> Q. Yesterday I believe, when you were answering Mr. Melvin's questions, you said something to the effect that the Wayne Memorial discrepancy policy was an archaic system as it existed in February of 2011. Do you recall that?
>
> A. Yes, sir.
>
> Q. Now, did you make any effort to call around to any hospitals other than Rex to find out what type of systems they were using for discrepancies?
>
> A. No, I didn't make any specific phone calls.
>
> Q. Okay. So you don't know if this Rex policy is similar to the type of policies that are being used in other hospitals throughout Eastern North Carolina?
>
> A. Well, I think every hospital operates a little differently. I can only speak for the fact that we have 24 hour coverage currently, and in 2011.
>
> . . .
>
> Q. Okay? You cannot say, as you sit here today, whether the policy that Wayne Memorial Hospital had in February

of 2011 is similar to that of other hospitals similarly situated in Eastern North Carolina at that same time.

A. No, I would have had to go back in time in 2011 and call each specific Emergency Department and find out what their policies were.

Q. Well, you could have done that in advance of your deposition two years ago. Correct?

A. Yes.

Q. You did not.

A. No, I didn't make any calls.

Q. And you haven't made any such calls or made any inquiry since May 13, 2014. Correct?

A. That's correct.

Dr. Quigley did not offer any testimony at trial that could establish the standard of care applicable to the policies or practices of hospitals in similar communities in 2011 concerning the time frame for communication of an over-read discrepancy between a radiologist and the emergency room staff. The absence of any testimony on the standard of care is consistent with Dr. Quigley's admission that he had not made any inquiries to determine the practices of other hospitals in 2011. We conclude that Dr. Quigley failed to offer evidence on the relevant standard of care and that, because Dr. Quigley was plaintiff's only witness on this issue, the trial court did not err by granting directed verdict in favor of the hospital.

In urging us to reach a different conclusion, plaintiff asserts that:

> Dr. Quigley testified that he was familiar with the standard of care in Goldsboro, N.C. and similar communities and that Wayne Memorial had violated the standard of care by having a system that allowed for a 28-hour delay in informing the emergency department that the X-ray had been misread. Dr. Quigley testified that in order to comply with the standard of care Wayne Memorial needed a system where the radiologist's interrogation [sic] of the X-ray needed to be brought to the attention of the emergency department within 4-5 hours.

Plaintiff's appellate brief cites pages 15, 55, and 61 of the trial transcript as the sources for these contentions. Plaintiff accurately cites page 15 for the statement that Dr. Quigley testified to his familiarity with the standard of care in Goldsboro and similar communities. However, the testimony presented on the other pages cited by plaintiff does not support plaintiff's position. Following is the testimony to which plaintiff refers:

> Q. Now this system that Wayne Memorial has about getting this information from Radiology to the Emergency Room, in your opinion, is that system within the standard of care for a hospital emergency room?
>
> A. No, especially not in 2011.
>
> Q. Why not?
>
> A. Well, if you look at the record it was actually read by the radiologist . . . [Mr. Johnson] was discharged early morning on the 11th, and was discharged home at that time at about 5 a.m. The radiologist over-read the film and had a report in the system electronically at 7:58 a.m. . . . [B]ut then there's a delay with this process with the midnight to midnight, then no one sees the discrepancy on the over-

read for 24, 28 hours. And this makes a difference clinically.

. . .

Q. . . . Now, to have a system or a policy that meets the standard of care, in your opinion, how long can the delay be? We've got about a 28 to 30 hour in Mario's case. If they're going to have a system that meets the standard of care, how long should the delay be?

A. I would say that, in 2011, with the electronic dictations into the chart, maybe 4 or 5 hours.

Q. All right. And that would -- I'm sorry.

A. Roughly. Roughly.

Q. Okay.

A. That's a guess.

Q. And that would mean, in Mario's case, that should have come to somebody's attention by what time?

A. Well, if you -- if you go by this system, if they read at 7:58 and someone's ongoingly pulling up these discrepancies, it should have occurred earlier on February 11.

Q. All right.

A. Sometime maybe early morning, late morning, early afternoon.

We conclude for several reasons that Dr. Quigley's testimony did not constitute competent evidence of the relevant standard of care or of the hospital's breach of that standard. First, Dr. Quigley offered no testimony or other evidence as to the policies

in effect at other hospitals in similar communities in 2011. In fact, as discussed above, Dr. Quigley admitted that he had never tried to obtain information on the subject. Dr. Quigley was asked how long the delay "should be," and not how long the delay actually was in comparable hospitals. As a result, the jury would have had no way to compare the time frame of this hospital's policy to that of other hospitals. Secondly, when asked how long the delay should be, Dr. Quigley candidly admitted that he could only guess. He estimated that the emergency room should be made aware of the radiologist's over-read within "roughly, roughly" "maybe 4-5 hours," which he conceded was "a guess." Taking into consideration Dr. Quigley's admitted lack of information about the pertinent standard of care, the absence of testimony establishing the standard, and Dr. Quigley's characterization of an appropriate time frame as a rough guess, we conclude that Dr. Quigley did not offer competent evidence on the standard of care or the hospital's breach of that standard.

## IV. Conclusion

Having reached this conclusion, we find it unnecessary to reach the parties' other arguments. We conclude that the trial court did not err by granting directed verdict in favor of the hospital and that its order should be

AFFIRMED.

Judges DILLON concurs.

Judge BERGER, JR. concurs in result only.