DIETZ, Judge.
*69 Plaintiff Hannah Marie Johnson Kearney appeals from a defense verdict in her medical malpractice action against Dr. Bruce R. Bolling. Kearney's lawsuit stems from serious complications she suffered following gallbladder surgery. She challenges a number of evidentiary rulings by the trial court, including the court's decision to permit testimony that Kearney's expert witness did not satisfy the criteria for expert testimony established by the American College of Surgeons, a voluntary organization to which the expert belonged. Kearney also challenges the trial court's determination that one of Dr. Bolling's expert witnesses was familiar with the standard of care in a community of similar size to Winston-Salem. Finally, Kearney challenges the trial court's grant of a motion *844 in limine and denial of a mid-trial motion to amend her complaint to add a new legal theory based on lack of informed consent.
Kearney's arguments present close questions. But this Court's review of evidentiary rulings and other mid-trial discretionary decisions by a trial court is severely limited. These rulings are reviewed for abuse of discretion and this Court can reverse only if the trial court's rulings appear so arbitrary that they could not be the result of a reasoned decision. Although we may not agree with all of the trial court's rulings below, we cannot say that those rulings were so manifestly arbitrary that they constituted an abuse of discretion. Accordingly, we find no error in the trial court's judgment.
Facts and Procedural History
On 17 March 2009, Plaintiff Hannah Marie Johnson Kearney went to the emergency department of Forsyth Medical Center in Winston-Salem, complaining of severe chest and abdominal pain. The emergency department consulted Defendant Dr. Bruce Bolling, who determined that Kearney had acute cholecystitis and needed to have her gallbladder removed. Dr. Bolling performed a laparoscopic cholecystectomy on Kearney on 17 March 2009. Kearney was discharged from Forsyth Medical Center on 18 March 2009.
Kearney returned to Forsyth Medical Center on 19 March 2009, complaining of severe pain. Dr. Bolling ordered several diagnostic tests, but the results of the tests were normal. Kearney again was discharged on 22 March 2009. On 23 March 2009, Kearney was readmitted to Forsyth *70 Medical Center. Dr. Bolling ordered a HIDA scan, which showed a bile leak caused by a hole in Kearney's right hepatic duct. As a result of the bile leak, Kearney required additional hospitalization and surgical procedures, including a roux-en-y surgery, to repair the leak. Kearney fired Dr. Bolling on 27 March 2009 and retained new doctors for these additional procedures.
On 30 September 2011, Kearney filed a medical malpractice complaint against Dr. Bolling alleging that Dr. Bolling was "negligent in his care and treatment" of her. On 18 January 2012, Dr. Bolling filed a motion to dismiss, arguing that Kearney failed to effect proper service of the complaint and summons. The trial court denied the motion.
The case went to trial on 15 July 2013. On the first day of trial, Dr. Bolling filed a motion in limine, asking the trial court to exclude any evidence "regarding or relating to Defendant's alleged failure to obtain informed consent" on the ground that "such allegations were not contained in the Plaintiff's Complaint and therefore the Defendant did not have proper notice of such allegation." The trial court granted this motion.
Later in the trial, Kearney moved to amend her complaint to add the theory of lack of informed consent after Dr. Bolling's counsel questioned Kearney on cross-examination about whether she had signed a consent form prior to her initial surgery. After hearing arguments from both parties, the trial court denied Kearney's motion, finding that the doctrine of amendment by implication was inapplicable and that the amendment would cause undue prejudice and surprise to Dr. Bolling.
Also during trial, Kearney tendered Dr. Brickman, a medical school professor of surgery, as an expert witness. The court accepted Dr. Brickman as an expert witness in the field of general surgery. Dr. Brickman testified that he was a fellow in the American College of Surgeons, "an honorary society to which you apply for admission after you become board-certified," and that "[i]t's a great honor to be a fellow." On cross-examination, defense counsel questioned Dr. Brickman regarding a document issued by the American College of Surgeons entitled "Statement on the physician acting as an expert witness" which sets forth "[r]ecommended qualifications for the physician who acts as an expert witness."
Over Kearney's objections, defense counsel questioned Dr. Brickman and established that he did not meet the American College of Surgeons' guidelines for providing expert testimony. Defense counsel also asked Dr. Brickman, "did you apply to medical school in the United States?"
*71 Dr. Brickman responded, "I did." Defense counsel then asked him, "Did you get in?" and Dr. Brickman responded, "I did not." Kearney did *845 not object to the admissibility of these two questions.
Dr. Bolling called his own expert witnesses during his case in chief. One of those experts, Dr. Todd Heniford, identified the American College of Surgeons' statement described above and the document was later accepted into evidence-over Kearney's objection-as Defendant's Exhibit No. 4. Dr. Heniford also testified-again over Kearney's objection-that Dr. Brickman was not in compliance with the American College of Surgeons' guidelines for expert testimony and that "[t]he American College of Surgeons would say that he absolutely should not be an expert witness ... honestly, he should rule himself out."
Dr. Bolling also proffered another expert witness, Dr. William Nealon, a specialist in pancreaticobiliary and hepatic surgery at Vanderbilt University in Nashville, Tennessee. Dr. Nealon testified that he was familiar with the standard of care in communities similar to Winston-Salem, North Carolina-specifically "Beaumont, Texas, where they have a hospital that is almost identical in size to Forsyth Hospital, and the community itself is almost identical in size.... And just judging by the demographics for Winston-Salem and Forsyth Hospital, it seems almost identical." Dr. Nealon also testified that he was familiar with Wake Forest University and that he "associate[s] and speak[s] with general surgeons at Wake Forest University."
Plaintiff's counsel then questioned Dr. Nealon, through voir dire, about his familiarity with Winston-Salem or similar communities. When asked how he knew the size of Beaumont, Texas, Dr. Nealon responded that he "read it in the newspaper." Plaintiff's counsel then presented demographic information to Dr. Nealon indicating that Beaumont, Texas was significantly smaller than Winston-Salem. The demographic information showed that in 2013 Beaumont had a population of approximately 118,000 compared to Winston-Salem's 234,000; Beaumont's hospital had 456 beds to Forsyth Medical Center's 681; and Beaumont's hospital had 20,658 admissions where Forsyth Medical Center had 40,938. Dr. Nealon testified that he believed the discrepancy was the result of a population decrease caused by a severe hurricane that hit the Beaumont area sometime after 2009.
After plaintiff's counsel completed the voir dire of Dr. Nealon, defense counsel asked Dr. Nealon, "do you believe that regardless of what the population is today in those cities, that you are familiar with the *72 standard of care for Winston-Salem or similar communities as it existed in 2009?" Dr. Nealon replied, "Yes, I feel very comfortable about that."
Defense counsel then tendered Dr. Nealon for acceptance as an expert witness, arguing that Dr. Nealon "has certainly demonstrated for this court that he is familiar with the standard of care in 2009 for the same or similar communities." Plaintiff's counsel objected, arguing that Dr. Nealon was not qualified to testify as an expert because he failed to establish his familiarity with the standard of care in Winston-Salem or a similar community because Beaumont, Texas was not sufficiently similar to Winston-Salem. The trial court found that Dr. Nealon met the statutory requirements for expert testimony. Dr. Nealon then testified that, in his opinion, Dr. Bolling "[met] the standard of care," "used his best judgment," and "used reasonable care" "in all respects, in the care and treatment of [Kearney] from March 17, 2009, through March 27, 2009."
On 2 August 2013, the jury returned a verdict in favor of Dr. Bolling. The trial court entered a corresponding judgment on 22 August 2013. Kearney timely appealed.
Analysis
I. Cross-Examination of Dr. Brickman
Kearney first argues that the trial court erred in allowing defense counsel to cross-examine Kearney's expert witness, Dr. Brickman, about the American College of Surgeons' policy statement on physicians acting as expert witnesses. Kearney contends that questions about the association's guidelines-which recommended that physicians in Dr. Brickman's position not testify as experts-undermined the trial court's ruling that Dr. Brickman was qualified to testify as an expert. We disagree.
*846 The trial court has "broad discretion in controlling the scope of cross-examination and a ruling by the trial court should not be disturbed absent an abuse of discretion and a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." Williams v. CSX Transp., Inc., 176 N.C.App. 330, 336, 626 S.E.2d 716, 723 (2006).
A party may question an expert witness to establish inconsistencies and "attack his credibility." State v. Gregory, 340 N.C. 365, 410, 459 S.E.2d 638, 663 (1995). "The largest possible scope should be given, and almost any question may be put to test the value of [an expert's] testimony." Id. (internal quotation marks omitted). Likewise, "[c]ross examination *73 is available to establish bias or interest as grounds of impeachment" because "[e]vidence of a witness' bias or interest is a circumstance that the jury may properly consider when determining the weight and credibility to give to a witness' testimony." Willoughby v. Kenneth W. Wilkins, M.D., P.A., 65 N.C.App. 626, 638, 310 S.E.2d 90, 98 (1983).
Here, Dr. Brickman testified that he belonged to the American College of Surgeons and that he considered it an honor to belong to the organization. The organization's guidelines state that doctors like Dr. Brickman, who are not actively practicing medicine in a clinical setting, should not testify as expert witnesses. Dr. Brickman chose to ignore those guidelines and testify in this case. The trial court permitted defense counsel to question Dr. Brickman about his violation of the organization's guidelines in order to challenge his credibility. Under the narrow standard of review applicable to evidentiary issues, we cannot say that the trial court's decision to permit this line of questioning "was so arbitrary that it could not have been the result of a reasoned decision." Williams, 176 N.C.App. at 336, 626 S.E.2d at 723. Accordingly, we must find no abuse of discretion.
Kearney responds by citing Goudreault v. Kleeman, 158 N.H. 236, 965 A.2d 1040 (2009), a New Hampshire Supreme Court opinion affirming the exclusion of similar testimony regarding the American College of Surgeons' guidelines. But even if Goudreault were binding on this Court-and it is not-it does not hold that the American College of Surgeons' guidelines never are admissible for impeachment purposes. The Goudreault court held, as we do here, that the trial court's evidentiary ruling was not an abuse of discretion under the narrow standard of review for evidentiary rulings. Id. at 1052. Nothing in Goudreault indicates that it would be an abuse of discretion to permit this line of questioning instead of excluding it; indeed, the nature of discretionary rulings means that two trial judges could reach opposite decisions on the same facts and yet neither ruling is reversible error.
Kearney next argues that questioning Dr. Brickman about his compliance with the American College of Surgeons' guidelines contradicts North Carolina Rule of Evidence 702(b)(2), which expressly permits medical school professors to testify as expert witnesses in medical malpractice actions. Kearney argues that the effect of the trial court's ruling was to permit a private agreement (the American College of Surgeons' guidelines) to supersede a state statute (the Rules of Evidence).
But that is not what occurred at trial. Dr. Brickman described his qualifications and expertise at length during direct examination and the *74 trial court accepted him as an expert witness in the presence of the jury. Later, during jury instructions, the trial court instructed the jury about what it meant to be an "expert witness" and stated that Dr. Brickman was "a medical expert witness." Thus, although Dr. Brickman's cross-examination concerning the American College of Surgeons' guidelines may have raised questions about credibility and motive to testify, it did not undermine the trial court's ruling that, as a matter of evidentiary law, Dr. Brickman was qualified to render expert testimony.
Finally, it must be noted that, following cross-examination, the trial court provided Kearney with the opportunity to rehabilitate Dr. Brickman through redirect examination, and Kearney did just that. In sum, we hold that the trial court's decision to permit cross- *847 examination concerning the American College of Surgeons' guidelines was within the trial court's sound discretion.
Kearney also argues that the trial court erred in permitting a line of cross-examination concerning Dr. Brickman's application to-and rejection from-medical schools in the United States. Kearney failed to object to these questions, and therefore this issue was not preserved for appellate review.[1] See N.C. R.App. P. 10(a)(1) (2013). In any event, for the same reasons discussed above, these questions could aid the jury in assessing Dr. Brickman's credibility and thus the trial court did not abuse its broad discretion in permitting this line of questioning.
II. Examination of Dr. Heniford
Kearney next argues that the trial court erred in allowing one of Dr. Bolling's experts, Dr. Heniford, to testify about the American College of Surgeons' guidelines. We again hold that the trial court did not abuse its broad discretion in permitting this testimony.
Dr. Heniford testified that he, like Dr. Brickman, was a member of the American College of Surgeons and was familiar with the organization's guidelines concerning testifying as an expert. The following exchange then took place:
DEFENSE COUNSEL: If the jury should find that Dr. Brickman did not have privileges, did not have an active *75 clinical practice, and was not board certified, is he in compliance with the qualifications as specified by the American College of Surgeons?
DR. HENIFORD: The American College of Surgeons would say that he absolutely should not be an expert witness. And honestly, he should rule himself out.
PLAINTIFF'S COUNSEL: Move to strike, Your Honor, what the American College of Surgeons would say.
THE COURT: The request is denied.
We find Dr. Heniford's answer troubling because he did not merely state his understanding of whether Dr. Bolling could testify consistent with the organization's guidelines, but went further and appeared to speak on behalf of the organization. The trial court certainly could have granted the motion to strike that testimony and instructed Dr. Heniford to limit his answer to his understanding of the guidelines.
But again, our review is sharply constrained by the narrow standard of review for evidentiary rulings. Although we may have ruled differently, we cannot say that the trial court's denial of that motion to strike "was so arbitrary that it could not have been the result of a reasoned decision." Williams, 176 N.C.App. at 336, 626 S.E.2d at 723. For example, the court may have believed, in light of the tone and demeanor of the witness unavailable to this Court in reviewing the trial transcript, that Dr. Heniford's answer simply conveyed his understanding of the rules of an honorary organization to which both he and Dr. Brickman belong. Thus, we are constrained to hold that the trial court did not abuse its broad discretion in declining to strike Dr. Heniford's testimony.
Kearney also argues that Dr. Bolling's closing argument improperly referenced the various testimony concerning Dr. Brickman's violation of the American College of Surgeons' guidelines. Because we find no error in the admission of this testimony, both during Dr. Brickman's cross-examination and during Dr. Heniford's direct examination, we likewise find no error in the references to that testimony during closing argument. Accordingly, we reject Kearney's argument.
III. Expert Testimony of Dr. Nealon
Kearney next argues that the trial court erred in qualifying one of Dr. Bolling's witnesses, Dr. Nealon, as a medical expert. Kearney contends that Dr. Nealon was not qualified to testify as a medical expert because he did not show that he is familiar with *848 the standard of care in *76 Winston-Salem or a similar community, a mandatory criteria for expert witnesses under N.C. R. Evid. 702(b) and N.C. Gen.Stat. § 90-21.12. Again, under the highly deferential standard of review applicable to these evidentiary rulings, we must reject Kearney's argument.
"[T]rial courts are afforded a wide latitude of discretion when making a determination about the admissibility of expert testimony." Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (internal quotation marks omitted). The trial court's "ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion." Id. A trial court's evidentiary ruling is not an abuse of discretion unless it "was so arbitrary that it could not have been the result of a reasoned decision." Williams, 176 N.C.App. at 336, 626 S.E.2d at 723.
In a medical malpractice action, the standard of care is defined as "the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action." N.C. Gen.Stat. § 90-21.12(a) (2013) (emphasis added). An expert witness "testifying as to the standard of care" is not required "to have actually practiced in the same community as the defendant," but "the witness must demonstrate that he is familiar with the standard of care in the community where the injury occurred, or the standard of care in similar communities." Smith v. Whitmer, 159 N.C.App. 192, 196, 582 S.E.2d 669, 672 (2003) (citation omitted).
The "critical inquiry" in determining whether a medical expert's testimony is admissible under the requirements of N.C. Gen.Stat. § 90-21.12 is "whether the doctor's testimony, taken as a whole" establishes that he "is familiar with a community that is similar to a defendant's community in regard to physician skill and training, facilities, equipment, funding, and also the physical and financial environment of a particular medical community." Pitts v. Nash Day Hosp., Inc., 167 N.C.App. 194, 197, 605 S.E.2d 154, 156 (2004), aff'd per curiam, 359 N.C. 626, 614 S.E.2d 267 (2005).
Here, Dr. Nealon testified that he was familiar with "Beaumont, Texas, where they have a hospital almost identical in size to Forsyth Hospital, and the community itself is almost identical in size." He testified that he was familiar with Beaumont and its demographic information both from his own experience there and from information he read in local newspapers. Dr. Nealon also testified that he was familiar with Wake Forest University Baptist Medical Center, also located in Winston-Salem, and that he had spoken with surgeons there.
*77 In response, Kearney presented demographic information on Beaumont, Texas, and Winston-Salem, showing that Beaumont and its hospital actually were markedly smaller than Winston-Salem and Forsyth Medical Center. Dr. Nealon did not dispute that information but testified that the population size of Beaumont declined as the result of a recent hurricane and that, in 2009 when Kearney's claim arose, Beaumont and Winston-Salem were similar communities with similar hospitals. When asked, "do you believe that regardless of what the population is today in [Beaumont and Winston-Salem], that you are familiar with the standard of care for Winston-Salem or similar communities as it existed in 2009," Dr. Nealon answered, "Yes, I feel very comfortable about that."
Kearney contends that the demographic differences between Beaumont and Winston-Salem as of 2013 required the trial court to find that the two cities were not similar communities as a matter of law. Kearney supports this argument with analysis of two cases in which this Court held that the similar community requirement of N.C. Gen.Stat. § 90-21.12 was not satisfied.
First, in Henry v. Southeastern OB-GYN Assocs., P.A., this Court held that the similar community requirement was not met where the proffered expert "failed to testify in any instance that he was familiar with the standard of care in Wilmington or similar communities."
*849 145 N.C.App. 208, 210, 550 S.E.2d 245, 246, aff'd per curiam, 354 N.C. 570, 557 S.E.2d 530 (2001). The doctor at issue in that case testified that he was familiar with the national standard of care, but was not familiar with Wilmington, North Carolina. Id. at 209-10, 550 S.E.2d at 246-47. The doctor practiced in Spartanburg, South Carolina, which the plaintiffs argued was similar to Durham or Chapel Hill, but there was no evidence in the record that Wilmington and Durham or Chapel Hill were the "same or similar." Id.
Second, in Smith v. Whitmer, this Court held that the similar community requirement was not met where the doctor proffered as an expert "asserted that he was familiar with the applicable standard of care," but "his testimony [was] devoid of support for this assertion." 159 N.C.App. 192, 196, 582 S.E.2d 669, 672 (2003). The doctor in that case "stated that the sole information he received or reviewed concerning the relevant standard of care in Tarboro or Rocky Mount was verbal information from plaintiff's attorney," but he could not "remember what plaintiff's counsel had purportedly told him." Id. at 196-97, 582 S.E.2d at 672. He "had never visited Tarboro or Rocky Mount, had never spoken to any health care practitioners in the area, and was not acquainted with *78 the medical community." Id. at 197, 582 S.E.2d at 672 (internal quotation marks omitted).
These cases are distinguishable. Here, Dr. Nealon testified that he was familiar with Beaumont, Texas; that he believed Beaumont was similar to Winston-Salem based on his knowledge of Beaumont and demographic statistics for Winston-Salem; that the demographic differences between Beaumont and Winston-Salem as of 2013 were the result of an intervening hurricane that displaced many Beaumont residents; that he has associated with surgeons from Wake Forest University Baptist Medical Center, another hospital in Winston-Salem; and that he felt "very comfortable" that he was "familiar with the standard of care for Winston-Salem or similar communities as it existed in 2009."
In light of this testimony, we cannot conclude that the trial court's ruling was "so arbitrary that it could not have been the result of a reasoned decision." Williams, 176 N.C.App. at 336, 626 S.E.2d at 723. Thus, under the deferential standard of review applicable to a trial court's admission of expert testimony, we hold that the trial court did not abuse its discretion in concluding that Dr. Nealon was familiar with the standard of care in communities and hospitals similar to Winston-Salem and Forsyth Medical Center.
IV. Grant of Motion in Limine and Denial of Motion to Amend
Lastly, Kearney argues that the trial court erred in granting Dr. Bolling's motion in limine and denying Kearney's motion to amend her complaint during trial, both of which had the effect of prohibiting Kearney from pursuing a claim based on lack of informed consent. As with Kearney's other arguments, we are constrained by the narrow standard of review applicable to these arguments.
The standard of review for a trial court's ruling on a motion in limine is abuse of discretion. Warren v. Gen. Motors Corp., 142 N.C.App. 316, 319, 542 S.E.2d 317, 319 (2001) ; Webster v. Powell, 98 N.C.App. 432, 439, 391 S.E.2d 204, 208 (1990), aff'd per curiam, 328 N.C. 88, 399 S.E.2d 113 (1991). Likewise, the decision to permit amendment of a complaint during trial rests in the sound discretion of the trial court and "[i]ts decision will not be disturbed on appeal absent a showing of abuse of discretion." Isenhour v. Universal Underwriters Ins. Co., 345 N.C. 151, 154, 478 S.E.2d 197, 199 (1996). Thus, as with Kearney's other arguments on appeal, this Court cannot find error and reverse on these issues unless the trial court's ruling "was so arbitrary that it could not have been the *79 result of a reasoned decision." Williams, 176 N.C.App. at 336, 626 S.E.2d at 723.[2] *850 Kearney first argues that her initial complaint asserted a claim based on lack of informed consent. We disagree. Ordinarily, a complaint need only contain a "short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief." N.C. R. Civ. P. 8(a)(1) (2013).
But medical malpractice claims are different. Rule 9(j) contains additional requirements for medical malpractice complaints. Rule 9(j) requires a statement that the plaintiff's medical records have been reviewed "by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care." N.C. R. Civ. P. 9(j)(1). Claims based on lack of informed consent are medical malpractice claims requiring expert testimony and therefore must comply with the requirements of Rule 9(j). See Estate of Waters v. Jarman, 144 N.C.App. 98, 101, 547 S.E.2d 142, 145 (2001) ; see also Clark v. Perry, 114 N.C.App. 297, 306, 442 S.E.2d 57, 62 (1994) ; Nelson v. Patrick, 58 N.C.App. 546, 548-49, 293 S.E.2d 829, 831 (1982). When a medical malpractice complaint asserts multiple theories of negligence with different standards of care, the expert or experts satisfying the Rule 9(j) requirement must be willing to testify to each applicable standard of care. N.C. R. Civ. P. 9(j)(1).
That did not happen here. Dr. Brickman, the expert who provided Kearney's Rule 9(j) certification, testified during his deposition that he was not aware Kearney intended to assert an informed consent claim until the issue came up during depositions. He did not review that theory of negligence before the complaint was filed and his opinion forming the basis of Kearney's Rule 9(j) certification did not address that standard of care.
It is "well established that even when a complaint facially complies with Rule 9(j) by including a statement pursuant to Rule 9(j), if discovery *80 subsequently establishes that the statement is not supported by the facts then dismissal is likewise appropriate." Ford v. McCain, 192 N.C.App. 667, 672, 666 S.E.2d 153, 157 (2008). Applying this legal principle here, we hold that the trial court did not err in concluding that the complaint "did not include the consent issue." That legal theory could be asserted only if, before filing the complaint, Kearney's expert had reviewed the underlying facts and was willing to testify that Dr. Bolling had not complied with the applicable standard of care concerning informed consent. We know for certain that this did not occur because Kearney's expert conceded that he was unaware of the informed consent issue until it first came up during discovery. As a result, the trial court did not abuse its discretion in granting the motion in limine excluding Kearney's informed consent evidence from trial.
Kearney also argues that, even if the trial court properly excluded the informed consent evidence initially, the court erred by denying her motion to amend during trial because defense counsel opened the door to this evidence by questioning Kearney about her consent to the medical procedure. As explained below, the trial court did not abuse its broad discretion in denying Kearney's motion.
Kearney contends that the following questioning by defense counsel opened the door on the issue of informed consent:
DEFENSE COUNSEL: Dr. Bolling came in, talked to you about the operation, and following the recommendation of the emergency department and Dr. Bolling, you consented to have your gallbladder taken out; correct?
KEARNEY: He came in. He did not discuss everything that was to be discussed. When the consent form was handed to me, sir, if you will look back on the first day and how much medication I was given, I was in and out.
DEFENSE COUNSEL: You did sign a consent form; correct?
*851 KEARNEY: I had to be woken up to sign a consent form from all the medicine I was on, sir.
Shortly after this questioning ended, Kearney moved for leave to amend her complaint to add a claim based on lack of informed consent, and the trial court denied the motion. Kearney argues on appeal that her motion should have been granted and that, in any event, the questioning amounted to an amendment by implication under Rule 15(b) of the Rules of Civil Procedure. Rule 15(b) states that "[w]hen issues not raised *81 by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." N.C. R. Civ. P. 15(b). The denial of a motion to amend under Rule 15(a) and the refusal to recognize a claim of an amendment by implication under Rule 15(b) both are reviewed for abuse of discretion. Tyson v. Ciba-Geigy Corp., 82 N.C.App. 626, 629-30, 347 S.E.2d 473, 476 (1986).
We hold that the trial court did not abuse its discretion by refusing to permit Kearney to pursue her informed consent claim for the first time mid-trial. Our case law governing amendments by implication requires that the parties actually litigate the new claim without objection. For example, in Taylor v. Gillespie, on which Kearney relies, this Court held that the pleadings were amended by implication to include a claim for resulting trust because the plaintiff introduced "evidence tending to establish the existence of a resulting trust" and the defendant did not object. 66 N.C.App. 302, 305, 311 S.E.2d 362, 364 (1984).
Here, by contrast, the parties did not litigate a claim for lack of informed consent at trial. All the jury heard were two isolated questions concerning the consent form that Kearney signed. Notably, there was no expert testimony concerning the standard of care and no other testimony establishing the elements of a malpractice claim based on the lack of informed consent. Thus, once again, we must conclude that the trial court's ruling was not an abuse of discretion. The court's decision not to permit this new theory to enter the case mid-trial rested soundly within the court's discretion to control the course of trial proceedings. That decision certainly was not "so arbitrary that it could not have been the result of a reasoned decision." Williams, 176 N.C.App. at 336, 626 S.E.2d at 723.
V. Insufficient Service of Process
Finally, Dr. Bolling argues, as an alternative basis to affirm the judgment, that the trial court erred in denying his motion to dismiss for insufficient service of process. Because we affirm the trial court's judgment, we need not reach this issue.
Conclusion
The trial court's evidentiary rulings and its denial of Kearney's mid-trial motion to amend were within the trial court's sound discretion. Accordingly, we find no error in the trial court's judgment.
NO ERROR.
Chief Judge McGEE and Judge McCULLOUGH concur.

Defense counsel asked Dr. Brickman questions about his rejection from U.S. medical schools repeatedly during cross-examination. The second time defense counsel asked the question, plaintiff's counsel objected stating "Objection. We've gone over the same thing." But Kearney did not object on the ground that this line of questioning was improper and the responses inadmissible.

Kearney argues that the standard of review on these issues should be de novo because they involve the trial court's legal interpretation of Rules 8 and 9 of the North Carolina Rules of Civil Procedure. We agree with Kearney that questions of law, including interpretation of the Rules of Civil Procedure, are reviewed de novo. But as explained in our analysis below, the trial court did not err in its understanding of the rules, and its rulings ultimately involved discretionary decisions subject to the abuse of discretion standard.