Potts v. KEL, LLC, 2019 NCBC 60.

STATE OF NORTH CAROLINA

IREDELL COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 2877

W. AVALON POTTS, individually
and derivatively on behalf of Steel
Tube, Inc.,

      Plaintiff,

v.

KEL, LLC; RIVES & ASSOCIATES,
LLP;

      Defendants,

   and

STEEL TUBE, INC.,

      Nominal Defendant,

   and

LEON L. RIVES, II,

      Defendant/
      Counterclaimant/
      Third-Party Plaintiff,

 v.

AVALON1, LLC,

      Third-Party Defendant/
      Counterclaimant.

**ORDER AND OPINION
ON RIVES DEFENDANTS'
MOTION IN LIMINE**

1.    This case is scheduled for trial on December 2, 2019. In this Opinion, the Court must decide whether to exclude the testimony of the plaintiff's expert witness.

*Moore and Van Allen, PLLC, by Mark A. Nebrig and John T. Floyd, for Plaintiff W. Avalon Potts and Third-Party Defendant/Counterclaimant Avalon1, LLC.*

*Sharpless McClearn Lester Duffy, PA, by Frederick K. Sharpless and Pamela S. Duffy, for Defendants Leon L. Rives, II and Rives & Associates, LLP.*

*No counsel appeared for Defendant KEL, LLC.*

Conrad, Judge.

I.
BACKGROUND

2.     The Court has described the nature of this dispute and the asserted claims in earlier opinions. *See Potts v. KEL, LLC*, 2019 NCBC LEXIS 30 (N.C. Super. Ct. May 9, 2019) ("*Potts II*"); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24 (N.C. Super. Ct. Mar. 27, 2018) ("*Potts I*"). Thus, the Court provides only a short summary here.

3.     This is a derivative action brought by Avalon Potts on behalf of Steel Tube, Inc.[1] Most of the claims are asserted against Leon Rives, II, one of Steel Tube's former owners and directors. Rives's tenure with Steel Tube was brief: he acquired a 50% interest from Walter Lazenby (one of the company's founders) in early 2015 but was forced out by Potts (the other founder and 50% owner) in early 2017. Put bluntly, Potts alleges that Rives spent most of that time plundering the company's assets.

4.     To begin, Rives allegedly funded his purchase of Steel Tube shares with the company's money: first, by issuing a $20,000 check to Lazenby and, then, by withdrawing $7,500 per month to pay additional installments to Lazenby. Rives later took a tax distribution of $62,875, which Potts alleges was unauthorized. Also, during this timeframe, members of Rives's family apparently formed two new businesses—Elite Tube & Fab, LLC ("Elite Tube") and KEL, LLC. As alleged, Rives funneled

---

[1] Potts asserted a number of individual claims, all of which were dismissed in earlier decisions. *See Potts II*, 2019 NCBC LEXIS 30, at *11–14, 33; *Potts I*, 2018 NCBC LEXIS 24, at *16–18, 19.

money and equipment from Steel Tube to Elite Tube and then approved a sweetheart deal with KEL to let it handle Steel Tube's transportation and trucking services.[2] Rives says he had good reasons for all of these transactions. Potts contends they amount to a breach of Rives's fiduciary duties and also give rise to claims for fraud, constructive fraud, unjust enrichment, and conversion.

5.      Potts further alleges that Rives's misconduct has put Steel Tube in tax trouble. Before Rives acquired an interest in Steel Tube, he and his accounting firm, Rives & Associates, LLP (together, "Rives Defendants"), had long provided tax preparation services and advice to the company. Rives & Associates continued to handle Steel Tube's taxes into 2015. According to Potts, Rives & Associates prepared and filed several inaccurate tax forms designed to give undeserved tax benefits to Rives. Those filings had to be corrected, resulting in fines, penalties, and related expenses. Potts attributes all of this to professional negligence by Rives & Associates.

6.      Altogether, Potts pegs Steel Tube's damages at over $2 million. He intends to call Gregory Reagan, a certified public accountant, as an expert witness to support that figure. Reagan prepared a report with twenty-five distinct but overlapping opinions on damages suffered by Steel Tube. In the same report, he also opines as to the relevant accounting standards of care and whether the Rives Defendants departed from those standards. (*See* ECF No. 125.15 ["Reagan Report"].)

---

[2] Both Elite Tube and KEL were named as defendants. KEL has made no appearance, and the Court has entered default. (*See* ECF No. 104.) Potts and Elite Tube reached a settlement, which the Court approved in May 2018. (*See* ECF No. 95.)

7.    The Rives Defendants have moved to exclude many of these opinions as irrelevant and unreliable.  (*See* ECF No. 138.)  Their motion has been fully briefed, and the Court held a hearing on September 9, 2019.  The motion is ripe for disposition.

## II.
## ANALYSIS

8.    "Expert testimony is governed by North Carolina Rule of Evidence 702, which is now virtually identical to its federal counterpart and follows the *Daubert* standard for admitting expert testimony."  *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2017 NCBC LEXIS 14, at *39 (N.C. Super. Ct. Feb. 24, 2017) (citations and quotation marks omitted).  "In other words, North Carolina trial courts now perform the same 'gatekeeping role' that federal district courts have long performed."  *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2018 NCBC LEXIS 239, at *4 (N.C. Super. Ct. Dec. 27, 2018) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

9.    The purpose of this gatekeeping role "is to ensure the reliability and relevancy of expert testimony."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Expert testimony can be helpful.  At times, it is essential.  Even so, courts have long worried about the effect of questionable expert testimony on a jury.  "Experts famously possess an 'aura of special reliability' surrounding their testimony."  *United States v. Upton*, 512 F.3d 394, 401 (7th Cir. 2008) (quoting *United States v. Brown*, 7 F.3d 648, 655 (7th Cir. 1993)); *see also United States v. Jones*, 107 F.3d 1147, 1161 (6th Cir. 1997) (noting "the mystique attached to 'experts' ").  It is up to the trial court to ensure that expert testimony serves its legitimate purpose—to

aid the jury with specialized knowledge—without compromising the jury's ability to independently evaluate all the evidence.

10. Some rules are crystal clear. For instance, "[i]t is well settled that an expert may not opine as to the credibility of a witness." *State v. Davis*, 828 S.E.2d 570, 573 (N.C. Ct. App. 2019). Likewise, an expert may not testify as to "whether legal conclusions should be drawn or whether legal standards are satisfied." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 587, 403 S.E.2d 483, 489 (1991). Such testimony would usurp the role of the judge, the jury, or both. "It is for the court to explain to the jury the given legal standard or conclusion at issue and how it should be determined," and "an expert is in no better position to conclude whether a legal standard has been satisfied or a legal conclusion should be drawn than is" a properly instructed jury. *Id.*

11. More generally, expert "testimony must meet the minimum standard for logical relevance" under Rule 401. *State v. McGrady*, 368 N.C. 880, 889, 787 S.E.2d 1, 8 (2016). And it must satisfy the three-part test set out in Rule 702(a): (1) the "testimony must be based on specialized knowledge"; (2) "the expert must be qualified"; and (3) "the testimony must be reliable." *Insight Health Corp.*, 2017 NCBC LEXIS 14, at *39 (citation omitted). Testimony is reliable if it "is based upon sufficient facts or data," if it "is the product of reliable principles and methods," and if "[t]he witness has applied the principles and methods reliably to the facts of the case." N.C. R. Evid. 702(a)(1)–(3). "The precise nature of the reliability inquiry will

vary from case to case depending on the nature of the proposed testimony." *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9.

12. Turning to this case, how does Reagan's anticipated testimony fare under these standards? His qualifications are not in dispute. But Rives and Rives & Associates seek to exclude part or all of more than twenty of his opinions as irrelevant, nonspecialized, or unreliable. The Court addresses these challenges below, observing at the outset that some of the parties' arguments are less developed than others.

### A. Standard of Care (Opinion 2)

13. A claim of professional negligence requires evidence that the defendant had a duty to conform to a certain standard of care (sometimes referred to as a standard of conduct) and that a breach of that duty proximately caused injury. *See Michael v. Huffman Oil Co.*, 190 N.C. App. 256, 271, 661 S.E.2d 1, 11 (2008). Though composed as a single opinion, some fifteen pages of Reagan's report are dedicated to the professional standards that apply to certified public accountants, including those published by the American Institute of Certified Public Accountants ("AICPA") along with a number of legal rules and regulations. (*See* Reagan Report 5–20.) Reagan opines that the Rives Defendants failed to conform to these standards, contributing to all of the damages itemized in the report's other twenty-five opinions. (*See, e.g.*, Reagan Report 20.)

14. The Rives Defendants concede in principle that Reagan can testify about pertinent professional standards. (*See* Br. in Supp. 8, ECF No. 139.) This makes

sense. "Ordinarily, expert testimony is required to establish the standard of care." *Associated Indus. Contrs., Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 410, 590 S.E.2d 866, 870 (2004). And, as relevant here, the standards that apply to tax and accounting professionals likely fall outside the common knowledge and experience of a lay jury. *See, e.g., Hassebrock v. Bernhoft*, 815 F.3d 334, 342 (7th Cir. 2016) ("The standard of care for accountants is established . . . with expert testimony.").

15. Where the Rives Defendants take issue with Reagan is in his application of the standard of care, though their objections have evolved over time. The opening brief argues, for example, that any testimony that the Rives Defendants "violated CPA rules and regulations" should be inadmissible; the reply brief backtracks and states that "Reagan can testify to violations of the standards." (*Compare* Br. in Supp. 8, *with* Am. Reply Br. 4, ECF No. 149 ["Reply Br."].) As best the Court can tell, the Rives Defendants are pressing four objections.

16. One is that Reagan improperly characterizes the alleged failures to conform to the standard of care as "negligence" and "gross negligence." (*See* Reply Br. 4–5; Reagan Report 20.) Potts, apparently conceding the point, represents that he does not intend to elicit this testimony at trial. The concession is a good one. Whether conduct was grossly negligent is a legal conclusion that the trier of fact must draw from the evidence, not a proper subject of expert testimony. *See Norris v. Zambito*, 135 N.C. App. 288, 292, 520 S.E.2d 113, 116 (1999); *see also, e.g., GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 343–44 (N.D.N.Y. 2013) (excluding expert opinion that defendant was guilty of gross negligence);

*Computalog U.S.A. v. Blake Drilling & Workover Co.*, 1996 U.S. Dist. LEXIS 19074, at *11 (E.D. La. Dec. 9, 1996) (same).

17. Second, the Rives Defendants argue that Reagan should not be allowed to testify that their conduct was dishonest, deceptive, or discreditable. (*See* Br. in Supp. 8.) The Court agrees. In his report, Reagan points to regulations that prohibit such conduct by accountants and then goes on to opine that "Rives violated many of these requirements by being dishonest, non-independent, deceptive, self-serving and engaging in conduct discreditable to the accounting profession." (Reagan Report 9.) There is no specialized knowledge at work here. It is simply a value judgment. So too for Reagan's assessment that Rives's actions were "shocking" and "disturbing." (Reagan Report 8, 14.) The jury will hear the evidence, including testimony from Rives, and draw their own conclusions about his honesty and integrity. The Court therefore excludes these aspects of Reagan's opinion. *See, e.g., In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 2017 U.S. Dist. LEXIS 69400, at *1019 (N.D. Ill. May 8, 2017) (excluding references to "unconscionable" and "predatory" conduct as inadmissible "value judgment[s]").

18. The third objection relates to the Rives Defendants' preparation of certain financial statements for Steel Tube. Reagan states that Rives & Associates prepared a compilation report along with these financial statements but did not provide the report to Steel Tube. (Reagan Report 10–11.) He opines that the failure to do so was a breach of professional standards. (Reagan Report 10–11.) In reaching this conclusion, Reagan did not review the report itself. (Reagan Report 10.)

19. The Rives Defendants contend that Reagan's failure to review the compilation report renders his opinion inadmissible. (*See* Br. in Supp. 9–10.) It does not. Reagan's opinion does not turn on the report's contents. Rather, his opinion is based on its omission. As Potts correctly observes, Reagan had no need to review the report before forming that opinion. (*See* Opp'n 8, ECF No. 143.)

20. Separately, the Rives Defendants dispute Reagan's understanding of the standards governing compilation reports. Reagan opines that a financial statement compilation is an "attest" service, (Reagan Report 6); the Rives Defendants contend that "Reagan is wrong," (Br. in Supp. 10). This is a matter best left to cross-examination. Both sides point to standards adopted by the AICPA. The Rives Defendants are free to challenge Reagan's understanding of those standards on cross-examination, and the jury may evaluate the correctness of his conclusions. *See J.S. & L.S. v. Am. Inst. for Foreign Study, Inc.*, 2013 U.S. Dist. LEXIS 136073, at *19–20 (W.D. Tex. Sept. 24, 2013) (holding that the jury must decide dispute over applicable standards).

21. Fourth, and last, is causation. Reagan's bottom-line conclusion in Opinion 2 is that all of Steel Tube's damages "were caused by" the Rives Defendants' failures to conform to pertinent professional standards. (Reagan Report 5.) In their briefing, the Rives Defendants argue that this is an improper legal conclusion. (*See* Reply Br. 4–5.) At the hearing, their counsel further argued that most of the claimed damages have no connection with any alleged breach of accounting standards of care. Potts

responds that "[e]xpert witnesses may appropriately explain issues of causation." (Opp'n 9.)

22. Expert testimony is common—even necessary in some cases—to establish causation for a claim of professional negligence. *See, e.g.*, *Rorrer v. Cooke*, 313 N.C. 338, 362, 329 S.E.2d 355, 370 (1985) (assessing whether expert affidavit created an issue of fact as to causation for claim of legal malpractice); *cf. Handex of the Carolinas, Inc. v. Cty. of Haywood*, 168 N.C. App. 1, 11, 607 S.E.2d 25, 31 (2005) (observing that expert testimony is unnecessary if "the common knowledge of lay persons is sufficient to find the standard of care required, a departure therefrom, or proximate causation" (citation and quotation marks omitted)). Indeed, tax and accounting matters are notoriously complicated. Here, Potts alleges that the Rives Defendants either botched or falsified a number of Steel Tube's tax forms. It appears that Reagan's testimony would assist the jury in understanding what corrective measures are necessary or prudent when these types of errors occur and whether the measures taken by Steel Tube qualify.

23. But to the extent Reagan intends to testify that the Rives Defendants' accounting misconduct caused *all* of Steel Tube's damages, that testimony is inadmissible. Damages testimony must be relevant to the asserted theory of liability. *See Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 713 (7th Cir. 2005) (affirming exclusion of expert testimony on damages that were "irrelevant and inapplicable to [the] theory of liability"). The purpose of Opinion 2, according to Potts, is to identify "the relevant rules governing Defendants' conduct *as accountants*."

(Opp'n 7 (emphasis added).) Some of the alleged damages—tax penalties, for example—may fairly be attributed to that conduct. Most of the claimed damages, however, have to do with Rives's purported self-dealing in his role *as an officer and director* of Steel Tube, issues governed by the statutory standards for corporate fiduciaries. *See, e.g.*, N.C.G.S. §§ 55-8-30, 55-8-42. Rives's alleged failures as an accountant are irrelevant to those damages.

24. Reagan's report provides no basis to conclude otherwise. His opinion seems to be that Rives's general "dishonesty and discreditable conduct" contributed to all of the asserted damages. (Reagan Report 12.) As noted, it is for the jury to evaluate Rives's honesty and integrity. Moreover, Reagan bases his conclusion on a passage from Rives's deposition in which Rives describes taking over the management of his father's accounting firm *in 2006*. (Reagan Report 11–12.) This is hardly relevant to Rives's conduct at Steel Tube ten years later.

25. The Court therefore declines to exclude Reagan's causation opinions in their entirety but excludes any testimony that the alleged accounting misconduct caused damages beyond those tax-related matters specified in his report. (*See, e.g.*, Reagan Report 11 (identifying tax-related matters in Opinions 7, 8, 9, 14, 23, and 25).) Counsel should take care to ensure that Reagan's testimony does not stray toward the ultimate legal conclusion of causation. It would be improper, for example, to ask Reagan whether the Rives Defendants' conduct was the "proximate cause" of injury. *State v. Ledford*, 315 N.C. 599, 617, 620, 340 S.E.2d 309, 321, 322 (1986).

## B. Tax-Related Damages (Opinions 7, 8, 14, and 23)

26. Of Reagan's twenty-five damages opinions, at least four stem from the alleged preparation and filing of inaccurate tax forms. He opines, for example, that Steel Tube's damages include all penalties and interest assessed by governing authorities (Opinion 14), an opinion the Rives Defendants do not seek to exclude. (*See* Reagan Report 31.) He also opines that Steel Tube should recover the fees paid to Rives & Associates to prepare the inaccurate forms (Opinion 7), the fees paid to another firm to redo the forms (Opinion 8), and the cost of a business valuation (Opinion 23). (*See* Reagan Report 24–26, 38.)

27. As to Opinion 7, the Rives Defendants object only to Reagan's use of the phrase "grossly negligent" in characterizing their work. (*See* Br. in Supp. 13.) Such testimony would be inadmissible for the reasons discussed above, and Potts does not intend to elicit that testimony at trial. (*See* Opp'n 12.) Outside of that narrow objection, the Rives Defendants do not seek to exclude Reagan's testimony that Steel Tube should be reimbursed for shoddy tax work.

28. As to Opinions 8 and 23, the Rives Defendants object to Reagan's reference to certain costs and fees as "unnecessary" on the ground that this is a legal conclusion of causation. (*See* Br. in Supp. 12, 13.) The Court does not view this anticipated testimony as a legal conclusion. Reagan may explain the steps that Steel Tube took to remedy the inaccurate tax filings and whether, in his experience, those steps would have been necessary in the absence of erroneous filings. Indeed, the Rives Defendants concede that, if Potts prevails, Steel Tube would be entitled to recover

any "fees paid to other accountants to correct any alleged wrongful work of Defendants." (Br. in Supp. 19.)

## C. Transactions for Rives's Personal Benefit (Opinions 3, 10, 13)

29. According to Potts, Rives breached his fiduciary duty by using Steel Tube's funds to pay his debt to Lazenby and by taking an unauthorized distribution to pay income taxes. Reagan tallies the amounts paid to Lazenby in Opinion 10, which the Rives Defendants do not seek to exclude. (*See* Reagan Report 27–28.)[3] Elsewhere, Reagan opines that Rives paid himself "excessive compensation" (Opinion 3) and that Rives took a tax distribution even though he had no tax liability (Opinion 13). (*See* Reagan Report 20–21, 30.) The Rives Defendants appear to concede that the amounts discussed in these latter two opinions are properly at issue, but they object to testimony that the transactions were excessive or improper. (*See* Br. in Supp. 13, 19.)

30. Whether any compensation received by Rives was excessive appears to relate to the standards that govern conflict-of-interest transactions between a corporation and a director or officer. Such transactions must be fair to the corporation. *See Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *45–46 (N.C. Super. Ct. Sept. 26, 2017). The Rives Defendants contend that Reagan "cites no factual support for his naked assertion" that the compensation was excessive. (Br. in Supp. 14.) But Reagan compares Rives's compensation with the compensation that

---

[3] Reagan opines that Rives diverted other payments for Lazenby's benefit, including insurance payments for Lazenby and his wife and excessive compensation for Lazenby's son as a Steel Tube employee. (*See* Reagan Report 31–33.) The Rives Defendants object to these opinions, but their barebones arguments provide no reasoned basis to exclude them. (*See* Br. in Supp. 13, 14.)

had been paid to his predecessor and analyzes the transaction in the context of Steel Tube's overall financial health. (*See* Reagan Report 21.) "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955–56 (8th Cir. 2007) (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). Accordingly, the Court declines to exclude Opinion 3 to the extent it addresses excessive compensation.

31. It bears noting, however, that Reagan's Opinion 3 also refers to the preparation and filing of a false 1099-Misc form. (Reagan Report 20–21.) The Court has dismissed claims for liability based on the 1099-Misc form. *See Potts II*, 2019 NCBC LEXIS 30, at *31–32, 34. Thus, that aspect of Opinion 3 must be excluded.[4]

32. Turning to Opinion 13, there is a dispute over whether the $62,875 distribution to Rives was authorized or not. Rives says it was and contends that the purpose of the distribution was to pay individual taxes. Potts, however, argues that the parties agreed not to take any distributions in part because both had the financial ability to pay their own taxes. Reagan opines that Rives had little or no tax liability during the relevant period, which, if true, could support Potts's account. (Reagan Report 30.) On balance, the Court concludes that Reagan's testimony would assist

---

[4] Though not mentioned by the Rives Defendants, Reagan summarizes a passage from Rives's deposition and remarks that it "lack[s] credibility." (Reagan Report 20.) Credibility is, of course, an issue for the jury, not a subject of expert testimony. *See, e.g.*, *Davis*, 828 S.E.2d at 573.

the jury in understanding the tax forms at issue, though with the caution that Reagan should not go beyond the forms to address Rives's motives or character.

### D. Elite Tube and KEL (Opinions 4, 5, 6, 11, 12, 20)

33. Potts also alleges that Rives breached his fiduciary duty by funneling money and equipment to companies owned by members of his family. The transactions include a $120,000 payment and other transfers of money and equipment to Elite Tube and a contract permitting KEL to handle Steel Tube's transportation services. Reagan offers six separate opinions on these transactions, all of which are subject to challenge in whole or in part by the Rives Defendants.

34. Potts admits that some of Reagan's opinions in this area have been superseded by events. Potts reached a settlement with Elite Tube as to the $120,000 payment, which this Court approved (*see* ECF No. 95), and it is well settled that a plaintiff may not obtain a "double recovery" for the same loss or injury. *Chemimetals Processing, Inc. v. Schrimsher*, 140 N.C. App. 135, 138, 535 S.E.2d 594, 596 (2000). Likewise, the Court granted summary judgment to the extent the claim for breach of fiduciary duty was based on the transfer of a piece of equipment (known as a roll former) to Elite Tube or on a payment allegedly made to create a website for Elite Tube. *See Potts II*, 2019 NCBC LEXIS 30, at *20–21, 33–34. The Court therefore excludes Opinion 4 in its entirety and Opinions 11 and 12 to the extent they are based on transactions no longer in dispute.

35. The Court also excludes Opinions 6 and 20, in which Reagan opines that Steel Tube incurred costs to recover assets from Elite Tube and that Rives sold

inventory from Steel Tube to Elite Tube at below-market prices. (*See* Reagan Report 23–24, 36.) Reagan could not determine the amount of these alleged losses. (*See* Reagan Report 23–24, 36.) In his opposition brief, Potts agrees that Reagan's damages calculation does not include amounts related to either of these opinions. (Opp'n 14.) Accordingly, the Court excludes this anticipated testimony.

36. In Opinion 5, Reagan opines that Steel Tube "paid excessive transportation charges" to KEL. (Reagan Report 22.) The Rives Defendants argue only that Reagan cites no factual support for his conclusion. (Br. in Supp. 14.) Not so. Reagan details the revenue made from KEL's deliveries, the cost paid to KEL for those deliveries, the total losses incurred by Steel Tube, and a comparison with the profits earned by Steel Tube when handling its own shipping in previous years. (*See* Reagan Report 23.) The Rives Defendants may test the factual support for Reagan's opinion on cross-examination. *See Synergetics*, 477 F.3d at 955–56 (holding that the factual basis for expert's opinion goes to its weight, not admissibility).

37. A seventh opinion deserves mention here (though it does not seem to relate to either Elite Tube or KEL). Reagan concludes that Rives undercharged several customers, resulting in a loss of more than $80,000. (Reagan Report 38–39.) These transactions are something of a mystery. Neither Reagan's report nor the parties' briefs provide much context. The Rives Defendants' position seems to be that the transactions occurred after Rives departed Steel Tube, making them irrelevant. (*See* Br. in Supp. 15, 16.) Given the state of the record, the Court cannot make an informed decision and concludes that it would be better to evaluate this opinion in the context

of the evidence presented at trial. Accordingly, the Court defers consideration of the exclusion of Opinion 24 until trial.

### E. Loan Interest (Opinions 9, 25)

38. Potts contends that the Rives Defendants' malfeasance put Steel Tube in financial strain and required it to take out millions of dollars in loans to stay afloat. In Opinions 9 and 25, Reagan calculates the loan interest that has been incurred to date and that is expected to be incurred going forward. (*See* Reagan Report 27, 39.)

39. The Rives Defendants argue that both calculations should be excluded but defer their reasoning to the reply brief. Their chief objection appears to be an alleged mismatch between Reagan's total damages calculation (just over $2 million) and the loans that Steel Tube supposedly needed (more than $3 million). (*See* Reply Br. 6– 7.) In other words, from the Rives Defendants' perspective, the loans should not have exceeded the loss.

40. This alone is not a sufficient reason to conclude that Reagan's methodology is unreliable. The Rives Defendants do not point to any principle of economics in conflict with Reagan's analysis. Moreover, Reagan bases his analysis of Steel Tube's loans on his separate conclusion, in Opinion 1, that Rives depleted Steel Tube's working capital by more than $1.6 million and that Steel Tube suffered a diminution in business value of around $1.3 million. (*See* Reagan Report 3–5.) The Rives Defendants do not address Opinion 1, much less identify any flaw in the methodology used to calculate these figures. Any dispute over the amount of loans precipitated by this capital depletion is one for cross-examination. *See Stecyk v. Bell Helicopter*

*Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.").

41. As a fallback, the Rives Defendants seek to exclude Opinion 25 because it "involves future interest payments, which have not been incurred and are speculative." (Reply Br. 7.) Damages are not speculative simply because they will occur in the future. *See, e.g.*, *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 407–08, 466 S.E.2d 324, 329 (1996) (noting that damages for future lost profits may be recoverable in appropriate circumstances). Here, Reagan specified actual loans taken by Steel Tube, prepared an amortization schedule for each based on existing interest rates, and calculated the net present value for all future interest payments. (*See* Reagan Report 25.) The details of these calculations are set out in several attached exhibits. The Court concludes that this opinion is not speculative. *See Watts v. N.C. Dep't of Env't & Nat. Res.*, 182 N.C. App. 178, 185–86, 641 S.E.2d 811, 818 (2007) (excluding damages for future interest where calculation was based on projected interest rates and not discounted to present value).

F. Matters Outside the Amended Complaint (Opinions 15, 18, 19, 21, 22)

42. The Rives Defendants challenge a final set of opinions on the ground that they go to matters not asserted in the amended complaint and are therefore irrelevant. (*See* Br. in Supp. 18; Reply Br. 8, 9.) Potts responds that "there is no requirement that a complaint identify every piece of evidence supporting each claim."

(Opp'n 16.) Alternatively, Potts contends that he should be allowed to amend his complaint to conform to the evidence under Rule 15(b) of the North Carolina Rules of Civil Procedure. (*See* Opp'n 16.)

43. Our State follows traditional rules of notice pleading. One of the purposes of the complaint is to frame the issues and put the opposing party on notice of them. Thus, the complaint must give "sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it . . . ." *Sutton v. Duke*, 277 N.C. 94, 104, 176 S.E.2d 161, 167 (1970). Both sides benefit. For plaintiffs, the notice requirement is backed up by liberal rules of discovery and the promise that leave to amend "shall be freely given when justice so requires." N.C. R. Civ. P. 15(a). For defendants, it is an assurance of sorts that they will not be blindsided by new claims or theories when preparing for trial.

44. At issue are four transactions, amounting to nearly $400,000, that are not recited in the amended complaint. Rives allegedly transferred more than $270,000 of Steel Tube's inventory to a company known as XSSteel, LLC without receiving anything in return. (Reagan Report 33–35.) Rives also authorized a payment of nearly $90,000 to McBride-Owens, Inc. for electrical and plumbing services that Steel Tube allegedly never received. (Reagan Report 37–38.) Then there are two smaller matters: $5,000 in unpaid invoices from Elite Tube, and $6,000 in unnecessary travel expenses billed by Rives & Associates. (Reagan Report 31, 37.) Reagan opines that Steel Tube is entitled to recover all of these amounts.

45. After scouring the amended complaint, the Court finds no allegations that give fair notice to the Rives Defendants that these transactions are at issue. XSSteel and McBride-Owens are never mentioned. Elite Tube is mentioned at length, but the amended complaint says nothing about this transaction, which involves alleged consignment sales of tubing manufactured by Steel Tube. Likewise, the amended complaint states a claim against Rives & Associates for preparing and filing false and inaccurate tax forms, but no allegations suggest a theory of liability based on overbilling. These are not simply additional pieces of evidence in support of existing claims as Potts contends. They are brand new theories of liability based on transactions that are substantially different from those recited in the amended complaint and that carry the potential for hundreds of thousands of dollars in additional liability. *See, e.g.*, *Coleman v. Coleman*, 2015 NCBC LEXIS 114, at \*8–9 (N.C. Super. Ct. Dec. 10, 2015) (concluding that complaint did not give fair notice of unasserted theory of liability); *Wake Cty. v. Hotels.com, L.P.*, 2012 NCBC LEXIS 63, at \*33 (N.C. Super. Ct. Dec. 19, 2012) (same).

46. Potts suggests that he cured any defect by disclosing the new theories in Reagan's report in June 2018. (*See* Opp'n 16.) "But it is the operative complaint that must adequately notify defendants of plaintiffs' claims." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Murillo*, 2017 U.S. Dist. LEXIS 126537, at \*15 (E.D. Cal. Aug. 9, 2017) (excluding theories first disclosed in an expert report). Courts routinely caution that parties should introduce new issues through the amendment process, not through briefing, discovery responses, or expert reports. *See, e.g.*, *Haigh v.*

*Superior Ins. Mgmt. Grp., Inc.*, 2017 NCBC LEXIS 100, at \*18 (N.C. Super. Ct. Oct. 24, 2017); *Brown v. Secor*, 2017 NCBC LEXIS 65, at \*19 (N.C. Super. Ct. July 28, 2017); *Henderson v. LeBauer*, 101 N.C. App. 255, 263–64, 399 S.E.2d 142, 147 (1991); *see also Murillo*, 2017 U.S. Dist. LEXIS 126537, at \*14–15; *Strong v. Walgreen Co.*, 2011 U.S. Dist. LEXIS 129339, at \*9–10 (S.D. Cal. Nov. 8, 2011).

47.     An amendment to conform to the evidence would not be proper either.  By rule, "[w]hen issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."  N.C. R. Civ. P. 15(b).  Trial has not yet begun.  If Potts seeks such an amendment at trial under Rule 15(b), the Court will address it at that time under the governing standards.  *See, e.g.*, *Kearney v. Bolling*, 242 N.C. App. 67, 81, 774 S.E.2d 841, 851 (2015) ("Our case law governing amendments by implication requires that the parties actually litigate the new claim without objection."); *Rink & Robinson, PLLC v. Catawba Valley Enters., LLC*, 220 N.C. App. 360, 367, 725 S.E.2d 426, 431–32 (2012) ("An amendment to conform to the evidence is appropriate only where sufficient evidence has been presented at trial without objection to raise an issue not originally pleaded and where the parties understood, or reasonably should have understood, that the introduction of such evidence was directed to an issue not embraced by the pleadings." (citation, quotation marks, and emphasis omitted)).[5]

---

[5] Potts offered evidence related to the XSSteel transaction in opposing the Rives Defendants' motion for summary judgment. (*See* ECF No. 118 at 7, 8, 15–16, 19.)  At the hearing on that motion, counsel for the Rives Defendants argued that the XSSteel transaction was not alleged in the complaint as a basis for the claim for breach of fiduciary duty.  The Court expressly declined to address the XSSteel transaction at that time. *See Potts II*, 2019 NCBC LEXIS 30, at \*14 n.2.  Accordingly, it would not be appropriate to treat the pleadings as having been

48.     For these reasons, the Court concludes that Reagan's Opinions 15, 18, 19, 21, and 22 are not relevant.  The Court therefore excludes them in their entirety.  *See McGrady*, 368 N.C. at 889, 787 S.E.2d at 8 (holding that expert testimony must be relevant).

### III.
### CONCLUSION

49.     For the reasons set forth above, the Court, in the exercise of its discretion, **GRANTS** in part and **DENIES** in part the motion.  The Court excludes Opinions 4, 6, 15, 18, 19, 20, 21, and 22 in their entirety.  The Court also excludes aspects of Opinions 2, 3, 7, 11, and 12 as described above.  Finally, the Court **DEFERS** consideration of Opinion 24's admissibility until trial.  In all other respects, the motion is **DENIED**.

**SO ORDERED**, this the 27th day of September, 2019.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases

---

amended to conform to the evidence during summary-judgment proceedings, which our courts have occasionally allowed.  *See Stephenson v. Warren*, 136 N.C. App. 768, 771, 525 S.E.2d 809, 811 (2000) ("We conclude that it is both proper and fair that the complaint in this case be treated as amended to conform to the evidence reviewed on the motion for summary judgment, noting that 'it is the better procedure at all stages of a trial to require a formal amendment to the pleadings.' ").